JAMES KING, JR., RESPONDENT, v. NEW JERSEY RACING COMMISSION, APPELLANT.

Argued May 13, 1986—Decided July 18, 1986.

*Michael J. Haas,* Deputy Attorney General, argued the cause for appellant (*W. Cary Edwards, Jr.,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Michael D. Schottland* argued the cause for respondent (*Chamlin, Schottland, Rosen, Cavanagh & Uliano,* attorneys; *Michael D. Schottland* and *Margaret L. Algarotti,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

The issues in this appeal are whether, upon the submission to the head of an administrative agency of a recommended determination by an administrative law judge in a contested matter heard in the Office of Administrative Law, a decision by the administrative agency made without a full quorum constitutes a failure to take action upon the recommended decision; and, if it does, whether the recommended determination of the administrative law judge is deemed approved under *N.J.S.A.* 52:14B–10. The appeal calls upon us to review these issues in light of an opinion of the Appellate Division that ruled that decisional action taken by the administrative agency without a full quorum was legally ineffective, and that therefore the recommended determination of an administrative law judge under such circumstances would be deemed approved under *N.J.S.A.* 52:14B–10.

This litigation originated in the eighth horse race held at Freehold Race Track on March 31, 1984. In that race, James King, Jr., a licensed harness driver, was driving a horse called Nancy's Best Bet. Despite the fact that Nancy's Best Bet was a rough-gaited horse, King drove an excellent race until approximately the final 95 feet of the home stretch. At that point a horse in front of King's broke stride and the driver pulled to the outside. King "grabbed" and steered his horse to the inside, and finished second by a head.

King's "place" finish was greeted with skepticism. On April 5, 1984, the Board of Stewards of the New Jersey Racing Commission (Commission) found that King had driven his horse "with design to prevent his winning" in violation of *N.J.A.C.* 13:71–20.10(a), and imposed a sixth-month suspension from racing. Two weeks later, the State Steward affirmed the fine and suspension. King appealed to the Commission, which referred the matter to the Office of Administrative Law (OAL) as a contested case. Following a hearing, the Administrative Law Judge (ALJ) issued an initial decision on September 6, 1984, concluding that no violation had occurred and that King should not be suspended. The initial decision was subject to review and final determination within the time limits prescribed in *N.J.S.A.* 52:14B–10.

The Commission sought and received two time extensions, which would have expired on January 11, 1985. On January 8, 1985, by a vote of two of its four members, the Commission rendered a decision rejecting the ALJ's recommendation, instead concluding that King had violated Commission regulations and suspending him for six months. King filed a notice of appeal with the Appellate Division, which stayed imposition of the suspension pending appeal.

In a reported decision, 205 *N.J.Super.* 411 (1985), the Appellate Division held that the Commission had voted without a quorum and therefore its decision rejecting the initial decision of the ALJ was invalid and void. It ruled that the ALJ decision is deemed to be adopted by the Commission under *N.J.S.A.* 52:14B–10. Accordingly, the court reversed the decision of the Commission and "remanded the matter for the processing" of the "Initial Decision of the ALJ as the final agency decision in this matter." *Id.* at 417.

The Commission filed a petition for rehearing, which the Appellate Division denied. The Commission then filed a petition for certification and King filed a cross-petition with this

Court. We granted the Commission's petition, but denied the cross-petition. 103 *N.J.* 471 (App.Div.1986).

I.

The question that we consider initially is whether the decision taken by the Commission rejecting the recommended decision of the ALJ was rendered by a quorum and was therefore valid. On this point, we agree with the Appellate Division.

Under *N.J.S.A.* 5:5–29, "[a] majority of the Commission shall constitute a quorum for the transaction of any business, for the performance of any duty, or for the exercise of any power of the commission." On the date upon which the Commission determined the matter, three of the four members of the Commission were present. Indisputably three commissioners were required to provide a majority quorum of the four-member Commission.

The existence of a quorum on that day turns solely on the status of Commissioner Stuart O. Goldsmith. Goldsmith was physically present but had recused himself from these proceedings at King's request.[1] This recusal left only two commissioners to make the final decision.

The Appellate Division observed that the general rule in state and federal courts in New Jersey is that "a member who is

[1]The Commission in its brief explains Goldsmith's recusal as follows:

In the performance of his duties as Chairman of the Racing Commission, Goldsmith had reviewed the videotape of King's race on April 14, 1984. There was no showing of interest, bias or prejudice on Goldsmith's part presented by King at the hearing. Nevertheless, in an *ex parte* letter to the Commission on December 27, 1984, King requested that Goldsmith "not participate in the ultimate decision in this matter" because he had previously viewed the videotape. Goldsmith * * * was physically present at the Commission's meeting on January 8, 1985 and his name is listed on the Commission's final decision of that date. However, at King's request Goldsmith did not vote on the appeal. In a letter sent to King by the Commission's Executive Director, Harold G. Handel, on January 9, 1985, Handel stated that "[i]t should be noted ... Goldsmith recused himself from the proceedings...."

disqualified may not generally be counted in order to make up a quorum." 205 *N.J.Super.* at 415. It noted the fact that Executive Director Handel, in a letter sent to King accompanying the Commission's final decision, had stated that Goldsmith had "recused" himself. Consequently, it held that Goldsmith's "voluntary recusal is tantamount to disqualification" and that Goldsmith had been incorrectly counted toward a quorum. *Id.* at 416.

The Commission argues that in these circumstances Goldsmith's mere presence may be counted toward satisfying the quorum requirement. It claims that it had relied in good faith upon *Morgan v. Saslaff,* 123 *N.J.Super.* 35, 37 (App.Div.1973). It stressed that because Goldsmith was not disqualified for reasons of interest, bias, or prejudice, and he did not participate in the decision solely at King's request, Goldsmith's presence at the meeting, as reflected by the fact that his name was placed on the final decision, was sufficient to enable him to be counted as part of the quorum that rendered the final decision.

In *Morgan,* the Appellate Division ruled that in a situation where three of five agency members heard a matter and two out of the three decided it, there was a legal quorum, that is, a majority of the total members was present and a majority of that quorum could validly act. 123 *N.J.Super.* at 37. There is no indication in *Morgan* that the third member who "heard" the matter had been disqualified; in effect, he remained in the case and actually participated in the decision by expressing a dissenting view. Here, Goldsmith, as noted, was disqualified. While he may have "heard" the proceedings in the sense that he was physically present and within earshot, he did not "hear" the case with any purpose toward contributing to the proceedings or participating in the deliberations or reaching and rendering a decision on the matter.

The court below also observed that in this situation "the better rule" was that a disqualified member may not be counted towards a quorum, citing *Aurentz v. Planning Board of Town-*

*ship of Little Egg Harbor,* 171 *N.J.Super.* 135, 141 (Law Div.1979). There, six of seven members of a township planning board were present to decide a matter before it. Three of the six members present abstained from voting due to conflicts of interest; the remaining three members voted for approval, and the planning board, believing that it had a quorum, declared the application to be approved. The court held that because the three abstaining members were disqualified from voting, they could not be counted towards the quorum and the planning board's decision was void. *Id.* at 141–42.

■ We are thus entirely satisfied that for purposes of determining whether a legal quorum is present, it is not relevant whether a member is physically absent, is disqualified because of interest, bias, or prejudice, or other good cause, or voluntarily recuses herself or himself. A member who is disqualified from participating in a particular matter may not be counted in determining the presence of a legal quorum. Here, as noted, Goldsmith was disqualified through his voluntary recusal. In the absence of purposeful participation in the deliberative proceedings, the facts that Goldsmith was physically present and his name "was placed" on the final decision are not significant. Moreover, we can agree with the Commission that it acted in good faith. Insofar as the presence of a legal quorum is in issue, all that matters is whether the physically present commissioner participated in agency deliberations and took purposeful action by joining, concurring in, dissenting from, or even abstaining from the final decision. Goldsmith did none of these things.

We conclude that a commissioner who was physically present at a meeting but who voluntarily recused himself and did not otherwise participate in the deliberative or decisional actions of the Commission may not be counted toward a quorum. Consequently, the final decision made by the Commission in this case was taken without a legal quorum and is invalid.

## II.

The next question is whether the consequent invalidation of the purported final agency decision rejecting the ALJ's initial determination triggers the "deemed-adopted" provision of *N.J. S.A.* 52:14B–10(c), or instead calls for a remand to the Commissioner for action by a quorum.

*N.J.S.A.* 52:14B–10(c) provides in pertinent part:

The head of the agency, upon a review of the record submitted by the administrative law judge, shall adopt, reject or modify the recommended report and decision no later than 45 days after receipt of such modifies or rejects the report within such period, the decision of the administrative law judge shall be deemed adopted as the final decision of the head of the agency. The recommended report and decision shall be a part of the record in the case. For good cause shown, upon certification by the director and the agency head, the time limits established herein may be subject to extension.

The Commission submits "that the purpose of this statutory requirement was to preclude an agency from unduly delaying the final determination of a contested case by failing to act in a timely manner to review the ALJ's initial decision." The more precise formulation of the issue is whether administrative agency action that is ineffective solely because of the absence of a quorum is as a matter of statutory construction to be considered a failure to act sufficient to result in the automatic approval of an initial determination of an ALJ under *N.J.S.A.* 52:14B–10(c).

The automatic-approval provision set forth in *N.J.S.A.* 52:14B–10(c) was intended to thwart undue delay in agency action. The provision is designed to encourage prompt consideration and disposition of contested cases. Timely resolution of such matters clearly serves the interests of the persons regulated by the agency, effectuates the agency's regulatory responsibilities, and advances the public interest in efficient and sound government.

These concerns were recognized by the Court in *In re Uniform Admin. Procedure Rules*, 90 *N.J.* 85 (1982). The Court there observed that the legislative objective in creating the Office of Administrative Law was to revamp the hearing and

decisional framework for administrative agencies. The purpose in creating a separate tribunal within that framework was to promote uniformity, efficiency, consistency, fairness, competence, and, most importantly, independence in the conduct of administrative hearings before state agencies. *Id.* at 91. *N.J.S.A.* 52:14B–10(c) directly contributes to the achievement of these goals by encouraging prompt and efficient administrative agency action.

It is important to recognize, however, that in creating the Office of Administrative Law, the Legislature pursued overlapping goals. While the statute creating the OAL focuses on the integrity of the hearing function, it also seeks to foster, enhance, and preserve agency jurisdiction and regulatory responsibility. *See Unemployed-Employed Council v. Horn*, 85 *N.J.* 646 (1981). The Court in *Uniform Admin. Procedure Rules* stressed that while the OAL is possessed of significant authority in the actual conduct of administrative hearings in contested cases on behalf of administrative agencies, the agency itself retains the exclusive right ultimately to decide these cases. 90 *N.J.* at 96. In *In re Kallen*, 92 *N.J.* 14 (1983), the Court emphasized that the agency itself in the exercise of its essential jurisdiction has the exclusive right to decide contested cases in administrative hearings. *Id.* at 20. The Court further observed the agency's jurisdiction in the final analysis is nondelegable and that the agency head remains accountable for the efficient and effective use of public resources in carrying out the agency's delegated statutory responsibilities. *Id.* at 21.

In ruling that the "deemed-approved" provision of *N.J.S.A.* 52:14B–10(c) should be applied in this case, the Appellate Division failed to give complete range to the several complementary legislative purposes encompassed in the statute creating the Office of Administrative Law. A wider view of the legislative intent is one that would promote hearing efficiency and independence and concomitantly preserve agency jurisdiction and responsibility.

In both parsing and weighing these legislative goals, a distinction is to be drawn between agency efficiency and agency responsibility. Agency delay and inaction, the evil that the deemed-approved mechanism was designed to remedy, is not therefore to be equated with agency action that is timely, clearly and unambiguously expressed, and fully explained, but which, by reason of a non-substantive defect, is imperfectly taken. This distinction should inform a court as to the propriety of applying the deemed-approved provision of *N.J.S.A.* 54:14B–10(c).

Thus were an administrative agency to proceed in bad faith, or with inexcusable negligence, or gross indifference, or simply to take no action whatsoever that purports "to adopt, reject or modify" the recommended report of the ALJ during the 45–day period following the issuance of the ALJ's initial decision, the "deemed-approved" provision of *N.J.S.A.* 52:14B–10(c) should be invoked; in that event the ALJ's initial decision should be transformed into the agency's final decision. However, where the agency takes action that addresses the merits of the ALJ's initial decision within the statutory time period, which action is later determined by a court to be legally ineffective due to a non-substantive error or procedural mistake made by the agency, the agency should be permitted to take remedial steps to cure the deficiency and to issue a decision.

In this case there is no indication of bad faith, inexcusable negligence, or gross indifference on the part of the Commission. The Appellate Division, however, held in effect that the Commission simply took no action whatsoever to determine King's appeal during the statutory time limitation of *N.J.S.A.* 52:14B–10(c), and, accordingly, the court ruled that this statutory provision converted the ALJ's initial decision into the Commission's final decision.

In our view the events surrounding the Commission's conduct should not be considered as total inaction under *N.J.S.A.* 52:14B–10(c). The Commission did not sit idly by and permit

the 45–day time limitation of *N.J.S.A.* 52:14B–10(c) to expire without taking action to decide King's appeal. Upon receiving the ALJ's initial decision, the Commission ordered the transcripts of the OAL hearing, obtained the hearing record and received the exceptions filed by both parties. Because of a delay in obtaining the transcripts from the reporting service, the Commission obtained not one extension, but two extensions of the 45–day review period. Moreover, when the Commission held its meeting at which King's case was actually presented, the case was duly considered, deliberated upon, and decided. The decision on that date reversing the ALJ's initial decision and suspending King from racing was hardly the product of inaction or a failure to act.

As noted, the court below found this action to be legally incorrect and, in effect, was nugatory. The Commission contends that the flaw in its action is a "technical defect." We recognize, as did the Appellate Division in *Aurentz*, that a statutory "automatic approval mechanism should be applied with caution," because its use could subvert the statutory scheme through manipulation. 171 *N.J.Super.* at 142–43. However, the improper manipulation to be feared is the orchestration of invalid agency action designed to trigger a statutory "automatic approval" provision. This fear, however, should not be exaggerated. Such machinations can be readily be ferreted out and identified. They stand in sharp contrast to action involving simply a non-substantive or insubstantial defect that can occur in the course of the agency decisional process, the correction of which would not be inimical to the purposes of the underlying statute or result in great unfairness to any party. *See Precision Industrial Design Co. v. Beckwith*, 185 *N.J.Super.* 9, 18–19 (App.Div.), certif. den., 91 *N.J.* 545 (1982) (an inadvertent and purely technical violation is subject to corrective and remedial action within a reasonable time after judicial nullification of original agency decision).

■ In the present circumstances, where the agency has clearly and unambiguously taken timely action, which by reason of a non-substantive defect is later found by a court to have been imperfectly taken, the deemed-approved provision of *N.J. S.A.* 52:14B–10(c) should not be invoked. In such circumstances, the matter should be remanded to the agency to correct the error and to issue a new decision.

### III.

A remand to the Commission under these circumstances for a redetermination of King's case with a valid quorum is not unfair to any party and is consistent with the underlying statute. It is particularly appropriate in this case in light of the jurisdictional and regulatory concerns of the Commission that are implicated by its decision. These considerations dispel any speculation that such a remand would be unimportant, futile, or unfair.

The Racing Commission's purposes are not to punish wrong-doers but rather to regulate the racing industry and to protect the interest of the public, which has a vital stake in maintaining the integrity of the horse racing industry. *Delguidice v. New Jersey Racing Comm'n*, 100 *N.J.* 79 (1985); *see Maietta v. New Jersey Racing Comm'n*, 93 *N.J.* 1, 11–12 (1983) (dissenting opinion) ("[T]he racing industry 'entail[s] inherent dangers and [is] clearly affected with a public interest' "). The need for regulation in this area has long been acknowledged. "The danger of clandestine and dishonest activity inherent in the business of horse racing has well been recognized. The business itself and the legalized gambling that accompanies its activities are strongly affected by a public interest. Corruption in horse racing activities is regarded as an affront to a publicly sponsored sport with the potential of far reaching consequences. Strict and close regulation is therefore regarded as highly appropriate." *Dare v. State,* 159 *N.J.Super.* 533, 536–37 (App.Div.1978).

We must be mindful of the consequences flowing from a rigid and inflexible application of the deemed-approved provision of

*N.J.S.A.* 52:14B–10(c). We do not believe that the Legislature intended such an application when this would serve only to frustrate the Commission's regulatory responsibility without any compensatory benefit in terms of overcoming any serious agency derelictions.

There can be little question that in this case the Commission's regulatory responsibilities would be thwarted by application of the automatic-approval provision of *N.J.S.A.* 54:14B–10(c). While we recognize here that the final decision was technically defective and legally ineffective, the members of the Commission who did decide the matter rejected the ALJ's findings of fact and conclusions of law and held that King "did in fact, violate *N.J.A.C.* 13:71–20.10(a) as charged." In making this ruling, they reviewed the transcript of the hearing, the video-tape of the race in question, and the correspondence and exceptions filed by the parties.

The commissioners found that King had driven his horse with the design to prevent his winning the race on March 31, 1984. As the State Steward testified, King's violation "was about as flagrant a violation [as] I have seen as a racing official." *See Delguidice, supra,* 100 *N.J.* 79. Indeed, as the court below expressly found, this decision was "supported by sufficient credible evidence on the record on the whole ..." and the six-month suspension imposed upon King was found to be reasonable and not disproportionate to the serious offense he had committed. 205 *N.J.Super.* at 414.

Accordingly, for all of the reasons stated, we reverse the judgment of the court below. The case is remanded to the Commission to enable it to determine the matter with a valid quorum.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*For affirmance*—None.