675 A.2d 243

NEW JERSEY RACING COMMISSION, PETITIONER–RESPONDENT, v. STEVE ELLIOT, JEFFREY LAPOFF, ROSEMARY SMUTZ AND ROBERT BONGIORNO, RESPONDENTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Submitted October 11, 1995—Decided May 3, 1996.

Before Judges DREIER, KESTIN and CUFF.

*Louis H. Miron,* attorney for appellants.

*Deborah T. Poritz,* Attorney General, attorney for respondent (*Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Shirley Allen,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

Four trainers licensed by the New Jersey Racing Commission appeal from a decision of the Commission imposing fines and suspending their licenses and privileges for extended periods ranging from thirty months to sixty-six months. We affirm.

The orders were based upon findings that horses under the care of each trainer had tested positive for the drug "fenspiride", thereby establishing violations of *N.J.A.C.* 13:71–23.6, the "trainer responsibility" rule, and *N.J.A.C.* 13:71–23.1, the "no medication" rule. The sanctions in each case included an eighteen-month suspension for the first instance in which a horse under a particular trainer's supervision was found with fenspiride in its system and twelve months for each additional instance.

After the respective races, customary testing was conducted of urine samples from the winning horses and others selected at random. On July 23, 1993, the first occasion on which a test for fenspiride was conducted, as well as on several subsequent occasions in the ten days following, the substance was detected. After repeat tests to verify accuracy, the trainers in this matter were charged.

The trainers requested and received a hearing before a panel of three racing judges, *N.J.S.A.* 5:5–37a; *N.J.A.C.* 13:71–1.20;

–2.3; –3.3, which determined that regulatory violations had occurred. The panel imposed fines and suspensions ranging from three years to six years. The record establishes that the Executive Director of the Commission communicated by telephone with the chief racing judge and specified the periods of suspension that, in his view, needed to be imposed.

The matter was ultimately tried in a contested case hearing pursuant to the Administrative Procedure Act, *N.J.S.A.* 52:14B–9 and –10. The administrative law judge issued an initial decision in which she found that fenspiride had been administered to the animals indicated on the occasions specified. In order to determine what penalties were appropriate, the judge reviewed the records of each of the trainers, surveyed available background on penalties previously imposed by the Commission for the use of various types of substances, and focused upon the fact that

> little is known about fenspiride. . . . [F]or many years fenspiride was thought to be a bronchodilator. Only the most recent literature, has described it as an anti-broncho constrictor with anti-inflammatory properties. All of this research involves the drug's effect on human beings, not horses. Furthermore, the latest study is not necessarily the best simply because it was done most recently.

The judge found also that the evidence before her provided no adequate basis to determine

> the nature and effect of fenspiride, particularly in horses. However, it is probable that whoever administered the drug to these horses was under the impression that it is a bronchodilator and therefore a performance enhancer since that would reflect the long term thinking about the drug rather than the most recent conclusions. Respondents have offered evidence to indicate that with a couple of exceptions, the horses performed primarily as expected rather than in any enhanced manner. The fact that the drug did not have the probable desired effect, however, should not in any way mitigate the penalty imposed.

She concluded

> that fenspiride should be treated as a Class 3 drug for purposes of imposing a penalty and the fact that it is not readily available for therapeutic purposes implies a surreptitious purpose in its administration and therefore, warrants a suspension toward the upper end of the range. With respect to the prior suspension records of each of the respondents, any prior suspensions for post race positives were

adequately explained or small enough in number and long ago so as not to be considered aggravating factors.

Based on her analysis, the judge determined

that a six month suspension should be imposed upon each respondent for the first reported post race positive for fenspiride and an additional four months should be added for each subsequent positive finding.

In so holding, the administrative law judge opined that

penalties of the magnitude originally proposed herein, for the purposes of deterring the use of "new" or previously undetected (or believed undetectable) drugs, [need to be established] through the rule-making process[,] *Metromedia, Inc. v. Director, Division of Taxation,* 97 *N.J.* 313 [478 *A.2d* 742] (1984)[,]

before they may validly be imposed in an individual case.

In reaching its final decision, the Commission essentially accepted the administrative law judge's findings and conclusions respecting the violations charged, the nature of fenspiride, the motives of those who administered the substance, and the responsibility of the four trainers. The Commission rejected the administrative law judge's penalty determinations and the reasoning that informed them. Instead, relying on the expressed intent of the governing regulatory scheme, *N.J.A.C.* 13:71–23.1(a); *see Dare v. State,* 159 *N.J.Super.* 533, 536–39, 388 *A.2d* 984 (App.Div.1978), the Commission determined that the use of a previously undetectable substance, with properties and effects not adequately understood, so compromises the integrity of horse racing and the health and safety of the animals involved, as to justify the imposition of severe penalties in an effort to inhibit any future inclinations among those in the industry to engage in conduct so illicit, hazardous, uncaring and experimentative.

On appeal, the trainers argue that they were denied due process of law by reason of the conduct of the "Executive Director [in] tampering with the board of judges [thereby tainting] the entire administrative process," and because the Commission shifted the burden of proof to the trainers to disprove allegations concerning fenspiride. They argue, further, that the suspensions imposed were arbitrary, capricious, excessive, and in violation of the Administrative Procedure Act.

■ We need not address the issue of taint stemming from the Executive Director's actions, or even whether his conduct exceeded his authority under *N.J.S.A.* 5:5–25 and –37. The interposition of a *de novo* contested case proceeding between the racing judges' decision, which the Executive Director sought to influence, and the final agency action in the form of the Commission's decision, cured the due process problem that the Executive Director's action created, by nullifying its effect. *See Moiseyev v. New Jersey Racing Comm'n,* 239 *N.J.Super.* 1, 10, 570 *A.*2d 988 (App.Div. 1989) ("Due process is satisfied if there has been a 'full and fair hearing' before [an] administrative law judge.")

■ We do not discern that any shifting of the burden of proof occurred here. The burden of establishing the trainers' culpability remained, throughout, with the Commission staff as proponent of the charges. Once it established that a "drug and/or substance foreign to the natural horse," *N.J.A.C.* 13:71–23.1(b), had been detected, the burden of going forward properly shifted to the trainers to show that the matter detected was not among the drugs or substances prohibited by the rule. *See Dare, supra,* 159 *N.J.Super.* at 537, 388 *A.*2d 984.

■ Finally, we do not regard the sanctions imposed to have been arbitrary, capricious or unreasonable, or in any way exceeding the Commission's authority, in the *Metromedia* sense or any other. There is ample basis in law establishing the Commission's authority "to protect the integrity of horse racing, to guard the health of the horse, and to safeguard the interests of the public and racing participants," *N.J.A.C.* 13:71–23.1(a), to justify severe, but not inherently unreasonable sanctions for surreptitious conduct as potentially destructive as that engaged in here. The governing rule is clear:

> Administrative agencies have wide discretion in selecting the means to fulfill their delegated duties. The choice of proceedings generally rests within the discretion of the agency. "Courts normally defer to that choice so long as the selection is responsive to the purpose and function of the agency."

[*In re C.V.S. Pharmacy, Wayne,* 116 *N.J.* 490, 503, 561 *A.2d* 1160 (1989) (quoting *Texter v. Department of Human Services,* 88 *N.J.* 376, 385–86, 443 *A.2d* 178 (1982)).]

With the principles of "trainer responsibility" and "no medication" clearly established in law, it is well within the authority and discretion of the Commission to impose severe sanctions for violations of those principles by conduct that is reasonably seen to be especially dire. Clandestine activity apparently undertaken in an effort to take advantage of the public and other racing participants is grievously violative of existing standards. Such activity that also endangers the horses by using substances with unknown properties, in respect of which appropriate protections are not yet in place, may reasonably be seen as especially nefarious. In these contexts, there is nothing in the Commission's choice of sanctions in respect of these four trainers that can be seen to have the earmarks of arbitrariness, caprice, unreason or excessiveness.

Affirmed.