696 A.2d 771

NEW JERSEY RACING COMMISSION, RESPONDENT,
v. RICHARD SILVERMAN, APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 19, 1997—Decided July 21, 1997.

Before Judges SKILLMAN, A.A. RODRIGUEZ and CUFF.

*Zulima V. Farber* argued the cause for appellant (*Lowenstein, Sandler, Kohl, Fisher & Boylan*, attorneys; *Ms. Farber*, of counsel and on the brief; *Dana Sade*, on the brief).

*Sherrie L. Gibble*, Deputy Attorney General argued the cause for respondent (*Peter Verniero*, Attorney General, attorney; *Joseph A. Yannotti*, Assistant Attorney General, of counsel; *Ms. Gibble*, on the brief).

The opinion of the court was delivered by

SKILLMAN, J.A.D.

Appellant Richard Silverman is a driver and trainer of harness racing horses licensed by the respondent New Jersey Racing

Commission (Commission). On October 23, 1993, appellant was the driver of "Tidewater Trick" in Garden State Park's eleventh race. The horse was the third favorite in a field of eight, with betting odds at race time of seven to two. However, the horse finished in fifth place.

On December 9, 1993, the Board of Judges at Garden State Racetrack determined that appellant had violated *N.J.A.C.* 13:71–20.10(b) [1] by using poor judgment and carelessness in the race and imposed a forty-five day suspension of his license. Appellant appealed to the State Steward, who affirmed the Board's decision. Appellant appealed the Steward's ruling to the Commission, which forwarded the matter to the Office of Administrative Law (OAL) as a contested case.

A hearing was conducted before Administrative Law Judge (ALJ) Persichilli on January 23, 1995. The Commission's only witness was Phyllis DeVitis, one of the three members of the Board of Judges which found that appellant had violated *N.J.A.C.* 13:71–20.10(b). DeVitis described four rule violations that appellant committed during the course of the race. First, appellant allowed the No. 6 horse to get in front of him and go to the rail, without attempting to close the gap. Second, appellant allowed a gap of two to two and one half lengths behind the horse in front of him to exist for about a half a mile, without attempting to close the gap. Third, appellant seesawed the bit in the horse's mouth, effectively holding the horse back. Fourth, appellant did not use sufficient effort in driving his horse down the stretch. DeVitis also expressed the opinion that a forty-five day suspension was "appropriate for this particular drive." However, on cross-examination DeVitis admitted that the Board discussed imposing a fifteen day suspension "for some length of time" but subsequently

---

[1] This rule provides:

> In the event a drive is unsatisfactory due to lack of effort, carelessness, misjudgment, or demonstrated lack of judgment in performance, and the judges believe that there is no fraud, gross carelessness, or a deliberate inconsistent drive, they may impose a penalty. . . .

agreed to impose a forty-five day suspension after the Commission's Executive Director informed one of the judges by telephone that he felt a longer suspension should be imposed.

Appellant testified in his defense that he has never had a major suspension, i.e., a suspension of ten days or more, in more than fourteen years of driving horses. Appellant had driven Tidewater Trick two weeks before the race at Garden State Park and found the horse to be calm and manageable. In that race, the horse came from ten lengths behind down the stretch to place second. On October 23, 1993, appellant's strategy was again to race the horse from behind. However, appellant soon discovered that Tidewater Trick was not running the same as he had two weeks earlier. At the first turn, appellant attempted to keep the horse relaxed and take him to the rail. However, the No. 6 horse moved in front of appellant and he settled into fourth position. Because appellant knew he "was in a very bad position," he decided to stay where he was and attempt to improve his position down the stretch. Appellant seesawed the bit in the horse's mouth to settle him down even though such action also would slow down the horse. Just past the three-quarter pole, appellant looked for an opportunity to go inside or outside and found none. At the top of the stretch, appellant was "leaning flat back," because he was trying to control the horse. He tapped the horse with his whip a few times at the wire to try to finish fourth but refused to beat the horse to finish better than fifth when he could not win. In hindsight, appellant would have "pulled the horse," perhaps affording a better chance to win.

Appellant also presented the testimony of Donato Latessa, the presiding judge on the Board of Judges assigned to Garden State Park on October 23, 1993. Although Latessa did not believe that appellant's horse could have finished higher than fifth, he agreed that appellant made no effort to "close the hole" into which the No. 6 horse dropped and that appellant could have closed the hole further in the stretch. Consequently, Latessa agreed that appellant had used poor judgment in the race, thus violating *N.J.A.C.*

13:70–20.10(b). However, Latessa also testified that the judges had agreed to impose a fifteen day suspension for this violation but that the Executive Director, without reviewing the videotape of the race or listening to the audiotape of the hearing before the Board, had placed a telephone call to one of the judges and instructed them to impose a forty-five day suspension. As a result, the other two judges changed the decision they had previously agreed upon and imposed a forty-five day suspension. Latessa testified that there had been two other occasions when the Executive Director had recommended imposition of a particular suspension for a violation of the rules in a race at which he was the presiding judge, and that when the judges failed to follow his recommendation on one of those occasions, the Executive Director had threatened to fire him. Latessa further testified that the Executive Director's intrusion into the judges' decision-making process constituted a departure from long-standing agency practice and was improper. Consequently, he refused to join in the decision imposing the forty-five day suspension. Shortly thereafter, Latessa was terminated from his position as a judge.[2] Latessa also testified that a fifteen day suspension was the usual sanction for a violation of *N.J.A.C.* 13:71–20.10.

On March 7, 1995, the ALJ issued an initial decision finding that appellant violated *N.J.A.C.* 13:71–20.10(b), and concluding that a fifteen-day suspension of his license was an appropriate penalty. The ALJ gave a detailed explanation of his reasons for imposing a

---

[2] Latessa subsequently filed a "whistleblower" action in federal district court against the Commission, and its individual members, Executive Director and Deputy Executive Director, alleging that the Commission's reason for not reappointing him was his publicly and privately expressed objections to the Executive Director's practice of intruding into the deliberations of the Board of Judges, and consequently that the Commission had violated the Due Process Clause of the Fourteenth Amendment and his free speech rights under the First Amendment. Latessa also asserted pendent State law claims. The district court granted defendants' motion for summary judgment. The Court of Appeals affirmed the dismissal of the counts of Latessa's complaint resting upon the Due Process Clause but reversed as to the counts resting on the First Amendment and State law. *Latessa v. New Jersey Racing Commission,* 113 *F.*3d 1313 (3d Cir.1997).

fifteen day suspension rather than the forty-five day suspension imposed by the Board of Judges:

> I am strongly influenced by the fact that three judges, Latessa, DeVitis and Bertola, independently determined that a fifteen-day penalty was proper. In the absence of compelling evidence in this record to support a greater or lesser penalty, I afford their experience and judgment high probative value. The record does not support a greater penalty, especially not the forty-five day suspension sought by the Commission (which was imposed following a phone call from the executive director). There is no evidence of how the executive director determined that the forty-five day-penalty was either reasonable or related to the facts, particularly in the absence of hearing tapes. On the contrary, there is reason to find that forty-five days is arbitrary and unreasonable. Judge DeVitis admitted that the judges did not consider Silverman's prior driving record. Silverman testified that his racing record contains no major violations in his twelve years of driving throughout various racing jurisdictions in the United States.... Consideration of this weighty factor in the context of the violation here, a violation more of appearance than intentional wrongdoing, supports a suspension of not more than fifteen days and, arguably, less.
>
> Viewed in its most favorable light, Judge DeVitis's testimony offers weak support for forty-five days as a reasonable and appropriate penalty particular to the racing misconduct in this case. She originally agreed to impose a fifteen-day suspension. Her penalty conclusion changed after she learned of her employer's wishes, because, as she said, "When someone you are working for makes a recommendation, you take it under advisement most seriously" (or words of similar import).... Judge DeVitis attempted to provide support for a number given to her, one that effectively increased the penalty she had previously found reasonable by 300 percent. Latessa's prior experience made it clear to him that his job was on the line if he failed to follow his employer's wishes. His testimony was uncontroverted and believable. Thus, the record shows that to one judge, Latessa, feared for his position if he did not follow the executive director's wishes and that a second judge, DeVitis, took the executive director's recommendation seriously enough to change her mind on what she initially thought was appropriate to the case. However, I cannot find that forty-five days is appropriate, because the record before me shows that the decision to impose forty-five days was founded upon intimidation and/or fear, or facts unknown.

The Commission considered this matter in an executive session on April 26, 1995 and voted to reimpose the initial forty-five day suspension. The Commission notified appellant of this decision by a letter dated April 27, 1995, which stated that "[a] copy of the Commission's written decision, which will memorialize its final disposition of this matter, will be forwarded to you together with a ruling implementing said decision." However, the Commission did not issue a written decision until nine months later, on January 22,

1996. In that decision, the Commission gave the following reasons for reimposing the forty-five day suspension originally recommended by its Executive Director:

A 15–day penalty would be appropriate where a driver, in fractions of a second, misjudges and fails to grasp an opportunity, or decides not to press the horse in the stretch. Here there was a lack of effort virtually from the beginning of the race to the finish line. This course of conduct, which we think would raise anyone's eyebrow, should result in more than the minimum penalty.

. . . .

A 15–day suspension does not address the seriousness of the offense which DeVitis testified had the appearance of being deliberate nor does it address the continuous and multiple acts that violate the rule. It is our judgment that a more severe penalty of 45–days should be imposed. . . .

Judge DeVitis testified that she thought 45 days was appropriate and we see no reason to doubt her word. Latessa testified in support of a 15–day suspension but he did not consider all of the violations DeVitis described at the OAL hearing and which we see on the video tape. . . . This fact alone explains their difference of opinion on penalty and makes Latessa's opinion on penalty unreliable. The ALJ also placed some weight on Silverman's testimony that he had no major violations on his record. Had he had a previous violation of this sort, a penalty more towards the 6 months end of the range would be appropriate.

. . . .

It would be more helpful to us if the ALJ would analyze the reasonableness of the penalty as it relates to the facts of the case rather than as it relates to the relative sincerity of the proponents of proposed penalties. . . . [A]n examination of the process whereby a decision is reached to propose a particular penalty does not tell us if that penalty is reasonable and proper given the facts presented at the OAL hearing.

Appellant filed a notice of appeal from this final decision. The Commission granted a stay pending the outcome of the appeal.

Appellant argues that the ALJ's recommended decision, which imposed a fifteen rather than a forty-five day suspension of his license, was automatically approved because the Commission failed to issue a written decision within forty-five days, as required by N.J.S.A. 52:14B–10(c). Appellant also argues that the intrusion of the Commission's Executive Director into the deliberations of the Board of Judges violates the Administrative Procedure Act (APA) and administrative due process. In addition, appellant argues that the forty-five day suspension of his license imposed by the Commission was arbitrary and capricious.

We conclude that the Executive Director's ex parte communications to the Board of Judges regarding the penalty they proposed to impose upon appellant was improper and that those communications tainted the Commission's final decision. We further conclude that the forty-five day suspension of appellant's license was arbitrary and capricious. Accordingly, we reduce the length of that suspension to the fifteen day period imposed in the ALJ's initial decision.

I

Although our decision does not rest upon the Commission's failure to issue a written decision within the forty-five day period allowed by *N.J.S.A.* 52:14B–10(c), we consider it appropriate to discuss this point. The purpose of *N.J.S.A.* 52:14B–10(c), which provides for the automatic approval of an ALJ's decision that is not reviewed in a timely manner by the agency head, is "to encourage prompt consideration and disposition of contested cases." *King v. New Jersey Racing Comm'n,* 103 *N.J.* 412, 419, 511 *A.*2d 615 (1986). However, the "automatic approval mechanism should be applied with caution." *Id.* at 422, 511 *A.*2d 615 (quoting *Aurentz v. Planning Bd. of the Township of Little Egg Harbor,* 171 *N.J.Super.* 135, 142, 408 *A.*2d 140 (Law Div.1979)). Consequently, this court "has been hesitant to conclude that an ALJ's initial decision has been automatically approved as a result of an agency's failure to properly discharge its decision-making responsibilities." *Town of Secaucus v. Hackensack Meadowlands Dev. Comm'n,* 267 *N.J.Super.* 361, 390–91, 631 *A.*2d 959 (App.Div. 1993), *certif. denied,* 139 *N.J.* 187, 652 *A.*2d 175 (1994). Reflecting this hesitancy, we have affirmed final agency decisions in cases where the agency sent a letter notifying the parties of its decision or announced its decision on the record during the forty-five day period without rendering a final written decision containing findings of fact and conclusions of law until some time later. *Steinmann v. Department of Treasury, Div. of Pensions,* 235 *N.J.Super.* 356, 360, 562 *A.*2d 799 (App.Div.1988) (two months), *rev'd on*

*other grounds,* 116 *N.J.* 564, 562 *A.*2d 791 (1989); *DiMaria v. Board of Trustees of Public Employees' Retirement Sys.,* 225 *N.J.Super.* 341, 348, 542 *A.*2d 498 (App.Div.) (two months), *certif. denied,* 113 *N.J.* 638, 552 *A.*2d 164 (1988).

However, the Supreme Court has warned that "were an administrative agency to proceed in bad faith, or with inexcusable negligence, or gross indifference, . . . the 'deemed-approved' provision of *N.J.S.A.* 52:14B–10(c) should be invoked; in that event the ALJ's initial decision should be transformed into the agency's final decision." *King v. New Jersey Racing Comm'n, supra,* 103 *N.J.* at 421, 511 *A.*2d 615. Moreover, we have indicated that even though "an exceptional and excusable lapse in timely conformance with the content requirements of *N.J.S.A.* 52:14B–10(d), . . . should not ordinarily result in application of the 'deemed approved' provision[,] . . . an agency may relinquish the benefit of this latitude by persistent disregard of its procedural responsibilities." *Chapel v. Board of Trustees of Public Employees' Retirement Sys.,* 258 *N.J.Super.* 389, 397, 609 *A.*2d 1294 (App.Div.1992). We also observed that "any State agency's repeated failure to discharge its legislated responsibilities . . . implicates considerations of [the] integrity" of the procedural requirements of the APA. *Id.* at 398–99, 609 *A.*2d 1294.

The Commission was seriously derelict in performing its responsibilities under the APA in this case. Since the ALJ's initial decision was served upon the Commission on March 13, 1995, it was required to issue its final decision no later than April 27, 1995. However, on April 26, 1995, the Commission simply announced that it was rejecting the part of the ALJ's decision relating to the length of the suspension of appellant's license, without issuing any written decision in conformity with *N.J.S.A.* 52:14B–10(d). The Commission then delayed nine months until it eventually issued its decision on January 22, 1996. During the intervening period, the Commission never applied to the OAL for an extension of time, as authorized by *N.J.S.A.* 54:14B–10(c) and *N.J.A.C.* 1:1–18.8, and the decision itself contains no explanation for the long delay in its

preparation and release. Consequently, we have no way of knowing whether there was some exceptional circumstance which might justify the prolonged delay in the Commission issuing its rather brief and uncomplicated decision or whether it follows the practice we condemned in *Chapel* of routinely announcing "a *pro forma* rejection of an [ALJ's] decision, . . . and unilaterally postpon[ing] the final decision," thereby "extend[ing] the administrative process in a way not contemplated by the Legislature." 258 *N.J.Super.* at 398, 609 *A.*2d 1294.

We have no need to pursue the point further because we conclude that the part of the Commission's decision relating to the length of appellant's license suspension must be reversed for other reasons. However, we take the occasion to again admonish state agencies that if a final decision rejecting or modifying an ALJ's initial decision is not issued in conformity with *N.J.S.A.* 52:14B–10(c) and (d), the ALJ's initial decision may be "transformed into the agency's final decision." *King v. New Jersey Racing Comm'n, supra,* 103 *N.J.* at 421, 511 *A.*2d 615; *see Mastro v. Board of Trustees of Public Employees' Retirement Sys.,* 266 *N.J.Super.* 445, 630 *A.*2d 289 (App.Div.1993).

## II

 The Executive Director's *ex parte* communication to the Board of Judges violated several fundamental tenets of administrative law codified in the APA.[3] First, the Executive Director's action was not authorized by the Commission's own rules. The APA requires a state agency to "adopt rules of practice setting forth the nature and requirements of all formal and informal procedures available." *N.J.S.A.* 52:14B–3(2). The purpose of this

---

[3] Appellant also argues that the APA and principles of administrative due process were violated by the Deputy Executive Director's participation in the Commission's deliberations. Because we conclude that the Commission's decision must be reversed for other reasons and the administrative record does not indicate precisely what role the Deputy Executive Director played in the Commission's deliberations, we do not address this point.

requirement is to provide notice of the agency's procedures to interested parties and assure that proceedings before the agency are conducted uniformly and fairly. *See In re Waterfront Dev. Permit No. WD88–0443–1*, 244 *N.J.Super.* 426, 432–34, 582 *A.*2d 1018 (App.Div.1990). A description of the manner in which quasi-judicial proceedings are conducted and the identity of the officials who are authorized to decide a disputed matter are fundamental aspects of any procedural rules. *See id.* at 434, 582 *A.*2d 1018.

In conformity with *N.J.S.A.* 52:14B–3(2), the Commission has adopted rules governing disciplinary proceedings against harness racing licensees. *N.J.A.C.* 13:71–1.19 provides that "[t]he steward and the Board of Judges may ... suspend ... any person who, in their opinion, has acted to the detriment of racing or violated the rules," and *N.J.A.C.* 13:71–1.20(b) provides that "[n]o race official other than the steward, the Board of Judges, and the starter shall have the right to impose a ... suspension, in the first instance." *N.J.A.C.* 13:71–8.22(a) provides that the Board "shall have authority to ... (i) impose fines and penalties as prescribed by the commission; [and][d]etermine all questions of fact relating to a race." And *N.J.A.C.* 13:71–8.23(a)(6) provides that before the Board may impose a penalty they shall afford the opportunity for a hearing which must be attended by at least the presiding judge and one associate judge. Moreover, *N.J.A.C.* 13:71–3.3(a) provides that "when the State Steward or Board of Judges conduct a hearing in the first instance ..., the respective decision of the State Steward or Board of Judges shall be final unless an appeal ... is filed with the Commission." The Commission's rules also provide that "[t]he Commission may modify on its own motion any penalty or decision imposed by a racing official," *N.J.A.C.* 13:70–1.28, and that "[t]he Commission may directly impose any disciplinary action provided for in its rules." *N.J.A.C.* 13:71–3.2. Therefore, the Commission's rules clearly contemplate that the initial determination of whether a licensee has violated the rules governing harness racing and the length of any suspension for a violation shall be made by a Board of Judges or the Steward.

The Commission relies upon *N.J.A.C.* 13:71–1.1, which provides that "[t]he Executive Director or his or her designee shall possess the same authority of the Racing Commission stewards and judges with respect to all provisions contained in the Administrative Code governing racing in New Jersey." However, even if this rule can be read to authorize the Executive Director to assume the role of a Board of Judges or the Steward in a particular disciplinary matter, it does not authorize him to engage in *ex parte* communications with the judges in a case in which the responsibility for an initial decision has been assigned to a Board.

The Executive Director's directive to the Board of Judges to impose a forty-five day suspension upon appellant is similar to the Attorney General's intrusion into the deliberations of the Board of Immigration Appeals which the Supreme Court condemned in *United States ex rel. Accardi v. Shaughnessy,* 347 *U.S.* 260, 74 *S.Ct.* 499, 98 *L.Ed.* 681 (1954). While a deportation proceeding was pending, the Attorney General sent the Board, an administrative agency within the Department of Justice whose members serve at his pleasure, a confidential list of "unsavory characters" who the Attorney General felt should be deported, including Accardi. The Court concluded that this communication constituted a violation of the Department of Justice's own regulations, which conferred initial decision-making authority upon the Board, subject to ultimate review by the Attorney General:

> The regulations just quoted pinpoint the decisive fact in this case: the Board was required, as it still is, to exercise its own judgment when considering appeals. The clear import of broad provisions for a final review by the Attorney General himself would be meaningless if the Board were not expected to render a decision in accord with its own collective belief.... In short, as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner.
>
> [*Id.* at 266–67, 74 *S.Ct.* at 503, 98 *L.Ed.* at 686.]

*See also United States v. Nixon,* 418 *U.S.* 683, 694–96, 94 *S.Ct.* 3090, 3100–02, 41 *L.Ed.*2d 1039, 1056–57 (1974).

In *In re Waterfront Dev. Permit No. WD88–0443–1, supra,* this court reversed the Commissioner of Environmental Protection's grant of a waterfront development permit on the ground

that this action violated the Department of Environmental Protection's own procedural rules. Those rules "delegate[d] the permit-issuing function to the Division [of Coastal Resources]," and contemplated that "[i]nvolvement of the 'Commissioner' as distinguished from the 'Division,' [would] come[ ] about only after an appeal [was] taken by an interested person aggrieved by a final decision of the Division." 244 *N.J.Super.* at 429, 582 *A.*2d 1018. We noted that "[w]hen an Administrative Agency promulgates rules to govern its proceedings, these rules must be scrupulously observed," and that "[i]f an agency in its proceedings violates its rules and prejudice results, any action taken as a result of the proceedings cannot stand." *Id.* at 434, 582 *A.*2d 1018 (quoting *Pacific Molasses Co. v. F.T.C.*, 356 *F.*2d 386, 389–90 (5th Cir. 1966)).

Similarly, the Executive Director's intrusion into the decision-making process of the Board of Judges was improper because it was not authorized by the Commission's own rules. Like the rules involved in *Shaughnessy* and *In re Waterfront Dev. Permit No. WD88–0443–1,* the Commission's rules provide that the initial determination of whether there has been a violation of the rules governing racing and the length of any suspension for a violation shall be made by a Board of Judges, subject to ultimate review by the Commission. Therefore, the Executive Director's *ex parte* communication to the Board regarding the penalty to be imposed upon appellant infringed upon its independence and violated the Commission's own rules.

The Executive Director's *ex parte* communication to the Board also violated the principle of exclusivity of the administrative record. The classic statement of this principle is set forth in Chief Justice Vanderbilt's opinion in *Mazza v. Cavicchia,* 15 *N.J.* 498, 514–516, 105 *A.*2d 545 (1954):

> In any proceeding that is judicial in nature, whether in a court or in an administrative agency, the process of decision must be governed by the basic principle of the exclusiveness of the record.... Unless this principle is observed, the right to a hearing itself becomes meaningless. Of what real worth is the right to present evidence and to argue its significance at a formal hearing, if the one who

> decides the case may stray at will from the record in reaching his decision? Or consult another's findings of fact, or conclusions of law, or recommendations or even hold conferences with him?
>
> . . . .
>
> That is why it is a fundamental principle of all adjudication, judicial and administrative alike, that the mind of the decider should not be swayed by materials which are not communicated to both parties and which they are not given an opportunity to controvert.

This principle is now codified in the APA, which provides that a final decision of a state administrative agency "shall be based only upon the evidence of record at the hearing." *N.J.S.A.* 52:14B–10(d); *see also N.J.A.C.* 1:1–14.5.

The Executive Director's communication to the Board of Judges violated this principle because it was made orally outside appellant's presence without affording him any opportunity to respond. In fact, appellant was never even notified of the Executive Director's *ex parte* communication. *Cf. High Horizons Dev. Co. v. State of N.J., Dept. of Transp.*, 120 *N.J.* 40, 53, 575 *A.*2d 1360 (1990) ("[I]ncluded among the elements of procedural fairness is a chance to know the opposing evidence and argument and to present evidence and argument in response."); *see also In re Dept. of Insurance's Order Nos. A89–119 and A90–125*, 129 *N.J.* 365, 609 *A.*2d 1236 (1992). The unfairness of this process became even more manifest when it was revealed that the Executive Director had recommended to the Board what penalty to impose upon appellant without reviewing either the videotape of the race or a transcript of the hearing. Therefore, the decision-making process in this case violated not only the principle of exclusivity of the administrative record but also the principles of "impartiality," "objectivity" and "fairness" which the APA was designed to promote. *Unemployed–Employed Council of N.J., Inc. v. Horn*, 85 *N.J.* 646, 650, 428 *A.*2d 1305 (1981).

The Commission's final decision expresses the view that it is "entirely appropriate for the Executive Director to make recommendations to the judges" in order to achieve "some uniformity in the penalties [imposed] for similar infractions" at the five racetracks under its jurisdiction. However, the Commission must

pursue this salutary objective in a manner which conforms with the requirements of the APA and administrative due process. For example, the Commission could adopt rules which set forth a schedule of penalties for particular infractions. The Commission also could adopt a rule under which a decision of a Board of Judges would become final only after the Commission itself had had an opportunity to review the penalty. But any procedure for internal review of a Board's proposed decision must be authorized by rule and conducted on the record. Such formalization of the Commission's procedures would assure that any internal review of the proposed decisions of a Board of Judges would result in greater uniformity in the Commission's decision-making process, rather than creating the appearance, if not the reality, of *ad hoc* interference in the Board's decisions for reasons unrelated to their merits.

## III

The Commission argues that even if the Executive Director's intrusion into the deliberations of the Board of Judges was improper, the final decision suspending appellant's license for forty-five days should be affirmed because it is supported by substantial credible evidence and did not constitute an abuse of discretion. The Commission relies upon *New Jersey Racing Comm'n v. Elliot,* 290 *N.J.Super.* 140, 145, 675 *A.*2d 243 (App.Div. 1996), in which we affirmed a final decision of the Commission, notwithstanding allegations that the Executive Director had improperly interfered in the judges' deliberations, because "[t]he interposition of a *de novo* contested case proceeding [before an ALJ] between the racing judges' decision, which the Executive Director sought to influence, and the final agency action in the form of the Commission's decision, cured the due process problem that the Executive Director's action created, by nullifying its decision."

Although the taint of the Executive Director's intrusion into a Board of Judges' decision-making process may be eliminat-

ed by an ALJ's *de novo* review under some circumstances such as in *Elliot,* our review of the record in this case convinces us that the Executive Director's actions infected the Commission's deliberations and resulted in an arbitrary and capricious decision. As the ALJ's decision points out, the Commission's case rested primarily upon the testimony of Phyllis DeVitis, a member of the Board which initially voted to impose a fifteen day suspension but then was persuaded by the Executive Director's *ex parte* communication to increase the suspension to forty-five days, and the Commission's final decision relies heavily upon her testimony.

Furthermore, while no persuasive evidence of administrative arbitrariness was presented in *Elliot* other than the Executive Director's involvement in the Board's decision, the forty-five day suspension imposed upon appellant far exceeds the usual sanction imposed for violations of *N.J.A.C.* 13:71–20.10(b). In *Moiseyev v. New Jersey Racing Comm'n,* 239 *N.J.Super.* 1, 570 *A.*2d 988 (App.Div.1989), we reduced the penalty for a violation of *N.J.A.C.* 13:71–20.10(b) from thirty to ten days, relying upon rules of the United States Trotting Association which limited the penalty for "lack of effort or carelessness" to ten days. We concluded that in the absence of a regulation authorizing a heavier penalty for this violation, *N.J.S.A.* 5:5–30 mandated the Commission to follow the Trotting Association's rules. *Id.* at 12, 570 *A.*2d 988. We also found a lack of evidence that the thirty day suspension was "consistent with the [Commission's] past practice." *Id.* at 13 n. 3, 570 *A.*2d 988. Although the Commission informed us at oral argument that the Trotting Association has repealed the rule relied upon in *Moiseyev,* appellant has directed our attention to recent decisions of the Commission which have imposed suspensions of less than forty-five days for violations of *N.J.A.C.* 13:71–20.10(b) and other comparable regulations even upon licensees who had prior infractions. In *Chavis v. New Jersey Racing Comm'n,* 94 *N.J.A.R.*2d (RAC) 6, 1993 WL 558231 (1993), the Commission imposed a thirty day suspension for a failure to give best efforts in a race upon a jockey who had been suspended for four previous careless riding infractions. In *New Jersey Racing*

*Comm'n v. Rice,* 95 *N.J.A.R.*2d (RAC) 9, 1994 WL 759326 (1994), *aff'd,* 96 *N.J.A.R.*2d (RAC) 15, 1996 WL 434441 (App.Div.1996), the Commission imposed a thirty-day suspension for an unsatisfactory drive, in violation of *N.J.A.C.* 13:71–20.10(b), and conduct detrimental to the sport, in violation of *N.J.A.C.* 13:71–7.29(a)(13), which the Commission characterized as an "enhanced penalty" based on a prior violation for unsatisfactory driving only seven months earlier. Therefore, we are convinced that the Executive Director's improper intrusion into the decision-making process of the Board of Judges resulted in a longer suspension of appellant's license than ordinarily would have been imposed.

Accordingly, we affirm the Commission's decision that appellant violated *N.J.A.C.* 13:71–20.10(b) but reduce the period of his license suspension from forty-five to fifteen days.