847 A.2d 592 (2004)
368 N.J. Super. 527
John CAVALIERI, Petitioner-Appellant,
v.
BOARD OF TRUSTEES OF the PUBLIC EMPLOYEES RETIREMENT SYSTEM, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted March 9, 2004.
Decided May 5, 2004.
*593 Piro, Zinna, Cifelli & Paris, attorneys for appellant (Alan Genitempo, Nutley, on the brief).
Peter C. Harvey, Attorney General, attorney for respondent (Patrick, DeAlmeida, Deputy Attorney General, of counsel; Thomas E. Lloyd, Deputy Attorney General, on the brief).
Before Judges STERN, A.A. RODRIGUEZ and LEFELT.
The opinion of the court was delivered by LEFELT, J.A.D.
After Doctor John Cavalieri had accumulated over twenty years of credited service, he requested a retirement estimate from the Board of Trustees of the Public Employees' Retirement System. The Pension Board determined that Cavalieri's retirement pension would be based upon a salary of approximately $50,000, which the Pension Board found was the doctor's annual compensation for three years of full-time employment earned during his years of service as medical director for the Toms River Regional School District. Cavalieri appealed, claiming his yearly compensation during the three-year period was actually $187,200.00. After conducting a hearing, an Administrative Law Judge (ALJ) agreed with Cavalieri. The Pension Board, however, reversed the ALJ, reinstating its original estimate. We conclude that the Pension Board utilized the wrong review standard in assessing the ALJ's factual findings. Consequently, we reverse and remand.

I.
The following facts were either uncontested or not disputed by the Pension Board. Cavalieri has been licensed to practice medicine in New Jersey since 1974. In 1978, he began a part-time relationship with the Toms River Regional School District. While maintaining a private practice, he conducted pre-employment physicals and sports' physicals and provided medical care to the School District's football team.
In 1986, recognizing that the School District had grown significantly, the District engaged Cavalieri as its medical director. As a condition of employment, the doctor discontinued his private medical practice and worked full-time for the District.
As medical director, Cavalieri provided medical care to approximately 16,000 students in the School District's three high schools, two intermediate schools, eleven elementary schools and one alternate school. Cavalieri worked from an office, which was provided by the District, completely paid for, and outfitted with sufficient medical equipment for the doctor to perform his functions. In addition, the School District employed the nurse who had previously worked with the doctor in private practice. All of the doctor's medical services and administrative responsibilities, such as coordinating public health programs, were performed out of the doctor's District office. The School District also paid the doctor's malpractice insurance and provided medical and dental insurance.
*594 During his employment by the District, which was a twelve-month per year position, the doctor did not see any private patients for the entire time he worked as medical director. The doctor's employment by the District was his sole source of income.
He was also a member of the teacher supervisor's union and received all of the customary benefits of a full-time employee of the District. Thus, the District accorded Cavalieri vacation time, sick time, holiday time, and professional time.
The doctor testified that he paid income tax on the $187,200 annually, for each of the years at issue. The School District reported a portion of the doctor's bi-weekly salary as employee income on W-2 tax forms and reported the remainder as non-employee income on 1099-Miscellaneous income forms.
In 1992, the School District advised Cavalieri that his full-time position was no longer required. The doctor continued to work part-time on a per diem basis as school physician and health coordinator, but he reopened his private practice, which he continued to run through the date of the administrative hearing in this matter.

II.
The parties' current dispute involves the "final compensation" that the District paid to Cavalieri for his services as medical director during 1989, 1990, and 1991. See N.J.S.A. 43:15A-6(h). The District had certified and reported to the Pension Board, as creditable pension income, for each of these years the amounts reflected only on Cavalieri's W-2s, $50,000, $51,874, and $55,764, respectively. The Pension Board advised Cavalieri that it would accept only these amounts as creditable income for pension purposes. After conducting a full hearing, the ALJ concluded that the Pension Board had erred and that Cavalieri's "pensionable compensation for the years at issue is $187,200 annually."
In reversing the ALJ, the Pension Board found that the "preponderance of the credible evidence supports the [Pension] Board's decision that Petitioner's creditable salaries for the years 1989, 1990 and 1991 were contained on the W-2 forms and not reflected by the combination of the W-2 and 1099-MISC forms as Petitioner asserted." The W-2 forms for the three years in question reflected "employee wages and salary." The 1099 or MISC form reports payment of "non-employee income." By definition, the Pension Board reasoned, only the amounts reflected on the W-2 forms constituted Cavalieri's "base salary."
The Pension Board further pointed out that the ALJ did not consider the fact that the compensation listed on the 1099 forms "were not subject to the standard payroll deductions, unemployment tax or social security deductions reserved for base or contractual salary. There were no contributions made by the District, on behalf of Petitioner, to the pension system for the sums listed on the 1099-MISC forms." Thus, the Pension Board concluded that the 1099 income was "non-creditable income."
According to the Pension Board "[a]ll of the credible, documentary evidence introduced at the hearing belies Petitioner's contention that his creditable base salary for the relevant time period is in excess of that determined by the Division [of Pensions]." The Pension Board believed Cavalieri's testimony was "inconclusive." Thus, according to the Pension Board, the ALJ "improperly accorded disproportionate weight to Petitioner's oral testimony."

III.
What the Pension Board did was to review this matter de novo, assemble the *595 evidence that favored its original position, and reverse the ALJ. In this manner, the Pension Board ignored the standard controlling its review and erred. In order to explain what was at issue, we must first detail the relevant statutes and regulations.
Under the pertinent statute, "[c]ompensation means the base or contractual salary, for services as an employee, which is in accordance with established salary policies of the member's employer for all employees in the same position." N.J.S.A. 43:15A-6(r). The statute warns, however, that the employee's compensation "shall not include individual salary adjustments which are granted primarily in anticipation of the member's retirement." Ibid. In addition, compensation does not include "additional remuneration for performing temporary or extracurricular duties beyond the regular workday or the regular work year." Ibid.
The pertinent regulations provide that a member's compensation, "creditable for retirement ... shall be limited to base salary, and shall not include extra compensation." N.J.A.C. 17:2-4.1(a). "`Base salary' means the annual compensation of a member ... in accordance with contracts, ordinances, resolutions or other established salary policies of the member's employer for all employees in the same position." N.J.A.C. 17:2-4.1(a)(1). The rule also provides that base salary, to be creditable, must be "paid in regular, periodic installments in accordance with the payroll cycle of the employer." Ibid.
The Pension Board conceded that Cavalieri had received more money from the District than the W-2 forms demonstrated. They conceded, did not cross-examine on the point, and did not dispute that Cavalieri had paid taxes on and earned $187,200 for each of the three years in question. Thus, the initial question was whether the $187,200 annual monies received by Dr. Cavalieri constituted his "base or contractual salary" as the School District's medical director and was not "additional" pay for "temporary or extracurricular" duties beyond the doctor's normal workday.
This is a factual question, upon which no expert witnesses testified. The administrative record was developed by lay persons including only Cavalieri, superintendent Dietrich, nurse Androvett, and Walter Schwedes, the Supervisor of the Division of Pensions Employer Education Unit. Schwedes was not qualified as an expert witness and testified in this case only about the Division of Pensions' normal procedures, policies, practices, and rules. The ALJ made his decision by evaluating the credibility of the lay witnesses and the documentary evidence. The judge explained that Cavaleri had some administrative and medical duties as medical director for the School District. Some of his physician duties "were performed outside of normal working hours during sporting events and the like. But, absent any indication from the School Board to the contrary, even those `extracurricular' duties seemed to be required from him as Medical Director." The judge continued by recognizing that "[p]erhaps some testing procedures were to occur beyond the normal workday," but the statute excludes from pension compensation only the performance of "temporary or extracurricular duties." According to the judge, the weight of the evidence demonstrated that Cavalieri "was entitled to, and received, compensation for regular on-the-job duties that" were in excess of the monies recorded on his W-2s. The ALJ found Cavalieri's "base or contractual salary" to be $187,200.
Under a relatively recent amendment to the APA, L. 2001, c. 5, § 4, the Pension *596 Board could not reverse an ALJ's factual finding based upon the credibility of a lay witness without demonstrating that the ALJ's findings were "arbitrary, capricious or unreasonable or ... not supported by sufficient, competent, and credible evidence in the record." N.J.S.A. 52:14B-10(c).
The Pension Board, in this case, was not at liberty to simply substitute its judgment for that of the ALJ's. The Pension Board, in fact, incredibly noted that they rejected Cavalieri's exceptions, and accepted "the exceptions filed by [the] DAG." When an ALJ has made factual findings by evaluating the credibility of lay witnesses, the Pension Board may no longer sift through the record anew to make its own decision, which will be affirmed if it is independently supported by credible evidence. See In re Taylor, 158 N.J. 644, 656, 731 A.2d 35 (1999); Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965). After the 2001 APA amendment, in order to reverse such a factual finding by an ALJ, the agency head must explain why the ALJ's decision was not supported by sufficient credible evidence or was otherwise arbitrary. N.J.S.A. 52:14B-10(c); S.D. v. Div. of Med. Assistance & Health Servs., 349 N.J.Super. 480, 485, 793 A.2d 871 (App. Div.2002).
Here, the Pension Board failed to satisfy this burden. In its decision, the Pension Board considered the ALJ's findings, but reversed by relying upon additional evidence present in the record. For example, the Pension Board relied upon the general definitions of what type income is reported on W-2s and 1099s. The Pension Board pointed out that the amounts of monies recorded on the 1099 forms were "non-employee income, ... [which] [b]y definition... do not fall within the definition of `base salary' and are, therefore, not creditable for pension purposes." The Pension Board indicated that the compensation paid on the 1099 forms was not subject to standard payroll deductions. As we pointed out in Chapel v. Bd. of Trs. of the Pub. Employees' Ret. Sys., 258 N.J.Super. 389, 393, 609 A.2d 1294 (App.Div.1992), however, this "issue may not be resolved by reliance on labels."
The Pension Board ignored the fact that Cavalieri had no control over how his salary was paid, which portions of the budget the District used to pay his salary, or indeed how the District chose to take deductions from the payments. It was the District that had total control over the payment of Cavalieri's compensation. There is no explicit requirement in the pertinent statute that to be base or contractual salary, there must be normal payroll deductions. N.J.S.A. 43:15A-6(r); N.J.A.C. 17:2-4.1. The Pension Board also ignored its own witness, Schwedes, who testified that it was not determinative for calculating pensions whether the funds were recorded on W-2s or 1099s.
The Pension Board also found determinative Cavalieri's three "work agreements" showing that his contractual salary for each of the years in question was the amount contained in the W-2 forms. Here, the Pension Board ignored superintendent Dietrich's testimony explaining how these forms were generated. The "agreements" the Pension Board relied upon were short typed statements addressed to the Superintendent and signed by Cavalieri for each of the years in question. The typed portion of the form stated in full "Yes, I am planning to continue as a member of the Toms River Regional Schools staff, effective (each form in this space had typed the next year's school dates), at a salary of (each of the forms had typed the amount found on Cavalieri's W-2 forms)."
*597 The Superintendent explained that the forms were sent to the staff toward the end of the school year to get an idea as to whether they would be returning for the next school year. The form contained "the salaries that they were going to, you know, anticipate getting." The Superintendent was asked whether the figures contained in the forms were the "actual salary that [Cavalieri] was entitled to pursuant to the agreement you had with him?" The Superintendent answered "No. The figures here, again, probably represented the draw, the $50,000 draw. Then it appears that when he joined TRISA, the supervisory association, there seemed to be here automatic raises."
The Superintendent explained that the contract they negotiated with the doctor was structured similarly to the way the Board of Education paid their counsel. Because the doctor was assuming a new position, the District did not know how to structure his salary. So, they patterned it on the Board of Education's arrangement with its counsel. The agreement was that the District "hired [Cavalieri] as a medical director, gave him benefits and set up a similar situation where we had a $50,000 draw and againstit would be $90 an hour against that draw after he had the $50,000 then he just continued, but in the budget itself[,] I think it was a $50,000 draw." The Superintendent testified that Cavalieri's actual salary was $90 an hour for full-time employment.
Apparently, Cavalieri would submit vouchers for his time and the District would collect the vouchers and pay him accordingly, with the first $50,000 coming from the budgeted amount for his position. Cavalieri explained that, while the first $50,000 came from budgeted funds and he received 1099's for the additional income he earned, the doctor did not know which part of the school budget the additional money was coming from. Similarly, the doctor had no control over what figures the District reported as creditable toward his pension.
The Pension Board also criticized Cavalieri's evidence as constituting "only inconclusive oral testimony." Both parties attempted to obtain relevant documents from the District, but because the documents were over ten years old, they had been destroyed in accordance with the District's normal document destruction policy. Thus the entire record was handicapped by an absence of the complete documentary record of Cavalieri's employment.
The ALJ considered the testimony supplied by Cavalieri, and most significantly, the testimony of Dietrich, the retired Superintendent of Schools for the District who had hired Cavalieri and remembered the terms of his contract, though his written contract was no longer available. Cavalieri explained he had no idea where the contract was, "but there was definitely a contract." Cavalieri, the Superintendent, and Cavalieri's nurse at the time, who had also been employed by the District, all testified to the full time nature of his employment. Each explained that the doctor had to give up his private practice and the doctor further explained that when he worked full-time for the District, he was not receiving any funds from any other employment.
Thus, the Pension Board rejected all of the ALJ's credibility findings without explaining why they were arbitrary or not based upon sufficient credible evidence. The Pension Board totally ignored the testimony of Superintendent Dietrich. The Pension Board is no longer at liberty to disagree with the ALJ's factual findings, involving lay witnesses, in this fashion. See S.D., supra, 349 N.J.Super. at 485, 793 A.2d 871. When such a record, involving lay witnesses, can support more than one *598 factual finding, it is the ALJ's credibility findings that control, unless they are arbitrary or not based on sufficient credible evidence in the record as a whole. See DeVitis v. N.J. Racing Comm'n, 202 N.J.Super. 484, 489-90, 495 A.2d 457 (App. Div.) (illustrating the previous standard), certif. denied, 102 N.J. 337, 508 A.2d 213 (1985). In this type of decision, the controlling choice is no longer the agency head's.
Just as we are bound by factual findings of a trial court, so too is the Pension Board bound when reviewing an ALJ's factual findings of lay witness testimony. N.J.S.A. 52:14B-10(c). To reverse such a finding, under the current APA, the Pension Board must explain why the ALJ's findings are unsupportable by the record, not simply that they disagree with the judge or would have decided differently from the evidence that was presented. Ibid.
Our review of the record, convinces us that the ALJ's finding that Cavalieri's contractual salary for each of the three years in question was $187,200 was based on sufficient evidence in the record, especially considering the ALJ's superior ability to assess credibility, and therefore should have been affirmed by the Pension Board.

IV.
Accepting the ALJ's factual finding, however, does not end the matter. We still must determine the legal consequences that flow from that fact. Unfortunately, the record is inadequate for us to address this question. Consequently, we must remand the matter for the Board to determine whether there are legal reasons that prevent Cavalieri's pension from being paid based upon the $187,200 annual salary or what conditions must be fulfilled to protect the integrity of the pension fund before Cavalieri's pension may be paid. We hope the following discussion will be helpful upon the remand.
The Pension Board must determine whether Cavalieri's annual salary, as found by the ALJ, can constitute "final compensation," upon which his pension allowance is calculated, despite the fact that pension contributions were made only upon the W-2 reported income. See N.J.S.A. 43:15A-6(h) (defining "final compensation") and N.J.S.A. 43:15A-48 (explaining how the pension allowance is calculated). In deciding this legal question, the Pension Board should also consider the impact, if any, of federal and state tax laws.
The ALJ explained that while the School District was aware of this case, they chose not to intervene and apparently chose to be bound by its result. Without assent in the record by the District, however, we are unwilling to accept that assessment. Upon the remand, the Pension Board should invite intervention or participation by the School District. See N.J.A.C. 1:1-16.4 and-16.6.
Assuming that the Pension Board determines that enhancement of Cavalieri's retirement pension is warranted, we note that under N.J.S.A. 43:15A-54, the Pension Board is empowered to correct an "error [that] results in an employee ... receiving from the retirement system more or less than he would have been entitled to receive." While the statute's language seems to deal with employees who are receiving benefits when the error is discovered, we do not believe the language should preclude a remedy for Cavalieri solely because the error was discovered before benefit payments began.
It should not be necessary for Cavalieri to begin receiving payments, erroneously calculated at the reduced level, for the statute to be activated. The statute "should be liberally construed and administered *599 in favor of the persons intended to be benefited thereby." Burkhart v. Pub. Employees Ret. Sys., 158 N.J.Super. 414, 423, 386 A.2d 428 (App.Div.1978) (quoting Geller v. Dept. of The Treasury, 53 N.J. 591, 597, 252 A.2d 393 (1969)). And "is specifically designed to correct past errors, caused not by the oversight of employees but by that of employers." Id. at 422-23, 386 A.2d 428.
The statute requires the retirement system to correct the error "and, so far as practicable, adjust the payments in such a manner that the actuarial equivalent of the benefit to which he was correctly entitled shall be paid." N.J.S.A. 43:15A-54. Furthermore, when dealing with credit for previous service, the statute contemplates payments of "additional contribution to the contingent reserve fund" by the employer and employee. Ibid.

V.
Cavalieri also contends that the ALJ's decision should have been "deemed adopted" as the agency decision because the Pension Board missed the APA mandated timeframes for issuance of its final decision. The ALJ filed his initial decision on February 5, 2003. The Office of Administrative Law extended the time frame for the Pension Board to file its final decision to May 5, 2003. On April 16, 2003, the Pension Board voted to reject the initial decision and issued its final decision on May 22, 2003.
The Pension Board signaled its intentions to reject the initial decision, before May 5, 2003, and issued its final decision reasonably promptly thereafter. See N.J. Racing Comm'n v. Silverman, 303 N.J.Super. 293, 302, 696 A.2d 771 (App.Div.1997). Accordingly, we have no cause to deem adopted the initial decision as the agency's final decision under N.J.S.A. 52:14B-10(c). Matturri v. Bd. of Trs. of Judicial Ret. Sys., 173 N.J. 368, 379-81, 802 A.2d 496 (2002); King v. N.J. Racing Comm'n, 103 N.J. 412, 421, 511 A.2d 615 (1986); Silverman, supra, 303 N.J.Super. at 302, 696 A.2d 771; Chapel, supra, 258 N.J.Super. at 396-97, 609 A.2d 1294. We do point out, however, that the Pension Board should have applied to the Office of Administrative Law for an additional extension for the period May 5, 2003 until the issuance of its final decision. N.J.S.A. 52:14B-10(c); Penpac, Inc. v. Passaic County Utils. Auth., 367 N.J.Super. 487, 497-98, 843 A.2d 1153 (App.Div.2004); Capone v. N.J. Racing Comm'n, 358 N.J.Super. 339, 350-51, 817 A.2d 995 (App.Div. 2003).
Reversed and remanded for further proceedings in conformity with this decision. We do not retain jurisdiction.