**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1537-22

IN THE MATTER OF JOHN
TAYAG-KOSKY, TOWN OF
KEARNY, FIRE DEPARTMENT.

_____

Submitted March 20, 2024 – Decided July 31, 2024

Before Judges Gummer and Walcott-Henderson.

On appeal from the New Jersey Civil Service Commission, Docket No. 2021-1785.

Feeley & LaRocca, LLC and The Blanco Law Firm, LLC, attorneys for appellant John Tayag-Kosky (John D. Feeley and Pablo N. Blanco, of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Brian D. Ragunan, Deputy Attorney General, on the statement in lieu of brief).

Appruzzese, McDermott, Mastro & Murphy, PC, attorneys for respondent Town of Kearny (Boris Shapiro, of counsel and on the brief).

PER CURIAM

Appellant John Tayag-Kosky appeals from a January 18, 2023 final

administrative agency decision of the Civil Service Commission (the Commission) upholding the decision of respondent the Town of Kearny to terminate him for conduct unbecoming a public employee, neglect of duty, insubordination, and other sufficient cause pursuant to N.J.A.C. 4A:2-2.3(a), as well as violations of several Kearny Town Code provisions premised on allegations that Kosky, while employed as a full-time firefighter for the Town of Kearny Fire Department (the Department), actively concealed that he was employed as a full-time military recruiter and an active-duty member of the Army National Guard.

Kosky admits that he was employed by both organizations from 2014 through 2018 but claims termination was too harsh a penalty and violated principles of progressive discipline because no rule of the Department bars him from holding secondary employment and the Department failed to consider his prior unblemished record. The Commission adopted the initial decision of the Administrative Law Judge (ALJ) rejecting Kosky's explanations for his actions and finding Kosky's removal appropriate under the circumstances. We affirm.

The essential facts are undisputed. Prior to applying to the Department, Kosky served as a full-time employee and active member of the Army

National Guard. In October 2009, Kosky applied for a full-time position as a firefighter with the Department. During this time, Steven Dyl served as Department Chief. On his employment application, Kosky disclosed his then-present employment with the Guard as a full-time (forty-hours per week) Recruiting and Retention NCO Career Counselor.[1]

After accepting the firefighter position, Kosky was required to attend the Fire Academy—a four-month course to obtain required firefighter and emergency medical technician (EMT) certifications—beginning in March 2010. Kosky missed the first day of the training because he had failed to notify his military command and to obtain a release from service to attend the Fire Academy. Kosky decided to resign[2] from the Recruiting and Retention Command with the Guard and was relieved from active-duty in order to pursue full-time employment in the Department.[3]

---

[1] At the Office of Administrative Law (OAL) hearing, he testified that from 1992 to 2001, he was a part-time reservist but transitioned to a full-time Recruiter in 2006.

[2] In his resignation letter, he indicated he would continue recruiting for the Guard Recruiting Assistant Program on a part-time basis.

[3] Chief Dyl testified that he had interviewed and recommended Kosky for hire and that after Kosky was hired, issues arose because Kosky "had missed the

Kosky served his first tour of duty as a firefighter from June 2010 through September 2010. According to Chief Dyl, the firefighter schedule was a 24/72 schedule: "as one on, three off . . . you work one day, [twenty-four] hours, you're off three days, . . . [i]t's a rotating schedule and it goes over an eight[-]week cycle where it again repeats itself." And, "[firefighters] are expected to be available [twenty-four] hours a day, [seven] days a week, in case there's an emergency in town and we need further assistance."

In October 2010, Kosky advised Chief Dyl that he had been ordered back to active-duty by the Guard. At the OAL hearing, Kosky testified that from October 2011 through February 2011, he had used his statutory leave entitlement under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. 4312(a) (USERRA),[4] to take a leave of absence from the Department because his son had been diagnosed with leukemia and he had to

_____

(continued)
first day of the academy," and "it was explained to him that he's got to participate in all aspects of the academy."

[4] Under USERRA a person who is absent from employment because of military service of less than five years is entitled to re-employment rights and benefits if they have "given advance written or verbal notice of such service to [their] employer . . . and . . . reports to, or submits an application for re-employment to, such employer[.]" Ibid.

4

"take away something . . . so that [he] could give [his] son full-time attention while doing . . . [his] military mission." Chief Dyl confirmed Kosky had submitted a request for military leave under USERRA and was placed on a military leave of absence beginning in October 2010.

It is undisputed that Kosky was placed on military leave and absent from the Department from October 2010 through July 2014, nearly three-and-one-half years. During this period, Kosky submitted several requests for military leave labeled as recalls to active duty and corresponding active-duty orders from the Guard including requests for leave from: October 2010 through February 2011, March 2011 through June 2011, and July 2011 through July 2014.

Kosky disputed that he was obligated to inform the Department when he returned to the Department in July 2014 that he remained on active-duty status with the Guard, stating "there's no policy in Kearny . . . or anything that I saw in USERRA that stated that I had to . . . give orders." He further testified that he had not produced his active-duty orders upon his return to the Department in 2014 because he chose "not [to] utilize [his] right for . . . USERRA."

At the OAL hearing, Chief Dyl testified it was his understanding that when Kosky returned to the Department in July 2014, he was on in-active duty

5

for the Guard while serving as a full-time firefighter, when in fact Kosky's active-duty orders from the Guard had been extended from July 2014 to July 2017.

According to Chief Dyl, Kosky worked as a full-time firefighter from 2014 to 2018 and during that time, he approved several leave requests for Kosky to attend military drills as it was his understanding Kosky was a part-time reservist who "did recruitment" and "weekend drills."[5]  Chief Dyl also testified that Kosky's requests for military leave—all except one dated April 15, 2017—for the period 2015 to 2018 indicated that he was on in-active duty in the Guard when in fact, Kosky was an active-duty member beginning in October 2010.

Chief Dyl became aware of Kosky's active-duty status in November 2018, when he questioned an extended leave request that Kosky had submitted to attend a military program and asked him to produce his military orders.  In response, Kosky provided a memorandum from a sergeant with the Guard of

---

[5]  From 2015 through 2018, Kosky submitted a total of six military leave requests for weekend military drills, which required him to request only one day off:  May 13, 2015 (one-day drill training); March 18, 2017 (one-day drill training); two requests from April 15, 2017 (one-day drill training); November 23, 2018 (one-day drill training); and January 12, 2018 (one-day drill training).

A-1537-22

equal rank, stating that Kosky "had been ordered back to active duty for a mandatory training," which raised further questions because, according to Chief Dyl, he would typically "get a formal letter explaining the dates and times of . . . active duty . . . from a higher ranking individual in the [Guard]." The orders Kosky presented to Dyl were in fact not valid military orders from a ranking official, and when he recognized that fact, Chief Dyl contacted the Department of Military Affairs.

In a letter dated December 18, 2018, a representative from the Department of Military Affairs confirmed that the memorandum Kosky had submitted was not an official military order. Chief Dyl testified that he had advised Kosky of his findings and Kosky eventually provided him with an active-duty order dated May 6, 2017, for the period from July 2017 through July 2020. Chief Dyl then requested for Kosky to produce other military orders, and, in response, Kosky provided an earlier order dated May 15, 2014, indicating that he had been on active duty from July 5, 2014, through July 4, 2017. Chief Dyl expressed shock that Kosky had been on active duty since 2014 because if he was on active military duty, "he should have been with the military, not the Town of Kearny." According to Chief Dyl, he questioned

A-1537-22

whether Kosky had been on active-duty with the military "his whole time with the [D]epartment."

Thereafter, Chief Dyl received a letter from Lieutenant Colonel Joseph Gagnon from the Guard, advising that Kosky was "assigned as a full[-]time recruiter within the Recruiting and Retention Battalion" and the Guard only "permit[s] recruiters to hold a second part[-]time job after duty hours" if "they don't interfere with the duty of recruiting." Lieutenant Colonel Gagnon also advised he was no longer approving Kosky to work as a civilian for the Department while on active-duty orders that were effective January 15, 2019. The Department subsequently placed Kosky on military leave.[6]

Kosky returned to work for the Department in March 2020.[7] Chief Dyl retired in July 2020, and his successor, Chief Joseph Mastandrea conducted the ensuing investigation into the allegations of misconduct by Kosky, including insubordination, conduct unbecoming a firefighter, falsifying documents,

---

[6] Chief Dyl advised Kosky that the Department would investigate and potentially take disciplinary action upon his return to the Department because charges could not be filed against him while he was on military leave.

[7] Kosky resigned from his full-time position as a Recruiter in the Guard in good standing and notified the Department of his intention to return on March 2, 2020. Accordingly, he received a certificate of discharge from the Guard on February 29, 2020.

8

hiding his active-duty orders, submitting misleading requests for leave to attend drills, neglect of duty, chronic absenteeism, and other sufficient cause.

In September 2020, Deputy Chief Bruce Kauffman, Deputy Chief Joseph Ferraro, and a union representative interviewed Kosky about the allegations of misconduct regarding his disclosures to the Department about his military status from March 2010 to the present. And, in October 2020, following the internal investigation into the allegations of misconduct against Kosky, the Department filed a preliminary notice of disciplinary action (PNDA) against Kosky. The Department terminated Kosky in May 2021 in its final notice of disciplinary action.[8]

Kosky appealed and, as a contested case, the matter was assigned to an ALJ for an OAL hearing. The plenary hearing was conducted over nine days. At the hearing, Deputy Chief Ferraro testified that in their interview, Kosky had explained the original "plan he concocted" was to get hired by the Jersey City Police Department or Kearny Fire Department while still maintaining his

---

[8] Shortly after issuing the PNDA, the Department amended it to include an additional allegation arising from a shoulder injury Kosky had initially reported as non-work related but subsequently reported as work-related. The Department charged Kosky with false reporting of a workplace injury but failed to substantiate the charge at trial.

active-duty military career and he explained that by maintaining both careers he would be entitled to receive both healthcare and retirement benefit packages.

Department Chief Mastandrea also testified at the OAL hearing. He summarized the basis for the charges, explaining that "for years Kosky hid the fact that his active duty orders had been extended and then submitted misleading requests to attend drills during that time frame and then ultimately when asked for orders to attend training[,] . . . he submitted a falsified, or a false memorandum to the same."

Chief Mastandrea also testified that Kosky had violated a provision of the Kearny Town Code requiring members of the Department "[to] serve the best interest of the [D]epartment by observing and reporting all matters pertaining to and concerning its welfare." He asserted that "by not submitting his active duty orders, it didn't give the chief at the time the ability to make the determination to put him on a military leave of absence." Chief Mastandrea also confirmed Kosky had no prior disciplinary history with the Department, but he felt Kosky "hiding the fact that he was an active duty member of the military" was misconduct "in and of itself" sufficient to support removal.

10

After considering the evidence, the ALJ concluded Kosky's testimony was self-serving and incredible and that there was ample proof in the record to sustain each of the charges.  Specifically, the ALJ found Kosky had "made a conscious decision to . . . slip between the cracks—and keep both military and paramilitary commands in the dark" and that his testimony to the contrary was not credible.  The ALJ did not find credible Kosky's representation that he had not thought it was necessary to inform the Department of his active-duty status in 2014, instead finding he had engaged in a "deliberate shell game" and that it was Kosky's intention "to keep both military and paramilitary chains of command in the dark about his full-time employment with the other" because "[h]e already knew what each would say, and he wanted to stay on both salaries and benefits."

The ALJ also found that Kosky "knowingly and intentionally" had produced a memorandum that was neither official nor authorized by his chain of command to avoid "the burden of telling the full truth" regarding the reason for his extended leave request in 2018.  According to the ALJ, Kosky had taken advantage of the fact that Chief Dyl would not have known the "wrong aspects" of the memorandum that were obvious to his lieutenant and that it was "simply not the equivalent of actually presenting [the Department] with his

11

three-year active duty orders in both 2014 and 2017." On this point, the ALJ further found that Kosky had "purposely failed" to disclose his active-duty status because "he knew from his experience that both [the Department] and the Guard . . . had issues with his accepting dual full-time positions in 2010-2011."

The ALJ found it beyond dispute that Kosky had an obligation to inform the Department of his active-duty status when he returned from leave in 2014 and his failure to do so was a material omission or misrepresentation. The ALJ found that Chief Dyl and Chief Mastandrea's testimony supported a finding that Kosky had an obligation to inform Kearny of his active-duty status. In making this finding, the ALJ relied on Kearny Code sections 3-63.1(b)(1) and 3-63.1(b)(11), which required Kosky to "devote [his] entire time to the service of the Fire Department" and provided that "members of the Fire Department shall at all times serve the best interest[] of the Fire Department by observing and reporting all matters pertaining to and concerning its welfare." The ALJ also highlighted Chief Dyl's testimony that "by failing to disclose his active-duty status," Kosky "took the determination and discretion as to the impact of his full-time military service on the welfare of the Department out of their hands." The ALJ concluded that Kosky's

"career-long, persistent acts of omission or commission . . . plainly constitute conduct unbecoming a public employee and were detrimental to the chain of command of the para-military organization of the . . . Department."

With respect to the USERRA, the ALJ found that contrary to Kosky's assertion that the USERRA protected him against termination, he "was never protected against termination of his Kearny employment . . . because he was never discharged [from active duty]." She further found that Kosky's testimony demonstrated a lack of understanding of the statute's protections because he "did not have the right to pick and choose when to trigger [the] USERRA" and "one of the central precepts of [the] USERRA is that a person is protected from losing their civilian employment because of military service[.]"

The Commission adopted the ALJ's findings and determination, concluding the ALJ had conducted a thorough analysis of the record and assessed the credibility of the witnesses. The Commission expressed its wholehearted agreement with the ALJ, stating Kosky "made a deliberate decision . . . to keep both military and paramilitary chains of command in the dark" and his actions "plainly constitute conduct unbecoming of a public employee and were detrimental to the chain of command" of the Department.

On appeal, Kosky argues a single point: the penalty of termination was arbitrary and violated principles of progressive discipline because no rule of the Department prohibits holding secondary employment and at no point was he unable to fulfil his obligations to the Department.

"Appellate courts have a 'limited role' in the review of [Commission] decisions." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). "Ordinarily, an appellate court will reverse the decision of the administrative agency only if it is arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole." Henry, 81 N.J. at 579-80. In reaching that determination, courts must consider:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474, 482 (2007)).]

"[A] 'strong presumption of reasonableness attaches to the actions of the administrative agencies.'" In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). Moreover, "[a] reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" Stallworth, 208 N.J. at 194 (quoting Carter, 191 N.J. at 483).

Although the concept of progressive discipline, which promotes uniformity and proportionality in the discipline of public employees, has long been a recognized and accepted principle, see West N.Y. v. Bock, 38 N.J. 500, 523-24 (1962), we have also long acknowledged that the theory of progressive discipline is not "a fixed and immutable rule to be followed without question . . . recogniz[ing] that some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record." Carter, 191 N.J. at 484. "Thus, progressive discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property." Stallworth, 208 N.J. at 196-97 (citing In Re Herrmann, 192 N.J. 19, 33 (2007)).

15

Further, deference to agency decisions "applies to the review of disciplinary sanctions as well." Herrmann, 192 N.J. at 28. "In light of the deference owed to such determinations, when reviewing administrative sanctions, 'the test . . . is whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness.'" Id. at 28-29 (alteration in original) (quoting In re Polk, 90 N.J. 550, 578 (1982)). "The threshold of 'shocking' the court's sense of fairness is a difficult one, not met whenever the court would have reached a different result." Ibid.

The burden is upon the appellant to demonstrate grounds for reversal. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002); see also Bowden v. Bayside State Prison, 268 N.J. Super. 301, 304 (App. Div. 1993) (holding that "[t]he burden of showing the agency's action was arbitrary, unreasonable[,] or capricious rests upon the appellant"). Finally, we give "due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility." Logan v Bd. of Rev., 299 N.J. Super. 346, 348 (App. Div. 1997). Thus, we will not disturb the ALJ's credibility findings unless they were "arbitrary or not based on sufficient credible evidence in the record as a

whole." Cavalieri v. Bd. of Trs. of PERS, 368 N.J. Super. 527, 537 (App. Div. 2004).

## II.

Applying those standards here, we discern no basis to reverse the comprehensive findings of the ALJ that were adopted by the Commission. Kosky admitted to the underlying facts the Department had used as the basis for his termination, including that after he was hired by the Department, he returned to active full-time duty with the Guard and failed to disclose his full-time, dual employment to either the Guard or the Department. Critically, Kosky also admitted he did not submit all active military orders to Chief Dyl prior to taking leave. More particularly, he testified, "I chose whether or not I want[ed] to hand in my orders," and that on his return from active duty in 2014, he did not advise the Chief that his active-duty orders had been extended. Instead of challenging these facts, Kosky explained before the ALJ that he believed he could hold both positions because there was no Department rule or policy preventing him from holding both full-time positions, and he did not provide his active-duty orders because Chief Dyl did not ask for them.

Nor do we find Kosky's termination shocking to our sense of fairness such that reversal is warranted. Herrmann, 192 N.J. at 28-29 (quoting Polk, 90

17

N.J. at 578).  Kosky argues termination was not justified and violated principles of progressive discipline since he had no prior discipline or infractions with the Department.  In making its determination on this issue, the Commission reviewed the ALJ's detailed findings and conclusions, including that Kosky's testimony was not credible and his actions warranted a departure from progressive discipline.  Progressive discipline is not "a fixed and immutable rule to be followed without question" because "some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record."  Stallworth, 208 N.J. at 196 (citing Carter, 191 N.J. at 484); Herrmann, 192 N.J. at 34-36.  The Commission's decision was clearly supported by the record which showed Kosky deliberately deceived the Department by failing to disclose he was holding two full-time positions in an effort to gain personal advantage in the form of additional pension and health benefits.

Having reviewed this record, we are satisfied the Commission's decision is supported by sufficient credible evidence as a whole and the sanction of removal was justified.  See Carter, 191 N.J. at 484.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1537-22