**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2841-24

PER ENGBLOM, Trainer,

     Petitioner-Appellant,

v.

NEW JERSEY RACING
COMMISSION,

     Respondent-Respondent.

_____

Submitted May 5, 2026 – Decided May 14, 2026

Before Judges Firko and Perez Friscia.

On appeal from the New Jersey Racing Commission, Department of Law and Public Safety, Agency Docket No. NJRC-4-H-24-MD.

BBC Law, LLP, attorneys for appellant (Ryan J. Mowll, on the briefs).

Jennifer Davenport, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Charles A. Shadle, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner Per Engblom, a horse trainer, appeals from the New Jersey Racing Commission's (the Commission) April 23, 2025 final decision suspending his trainer's license for 380 days, fining him $6,000, disqualifying the horse—Mon Amour—from sharing in the purse, and imposing eight multiple medication violation (MMV) points. The Commission rejected the Administrative Law Judge's (ALJ) recommendation to reduce the penalty to a ninety-day suspension. For the reasons that follow, we affirm.

I.

We recite the procedural facts and history from the record. The subject Meadowlands race was held on April 29, 2023. Engblom's horse, Mon Amour, won the sixth race. Following the race, Mon Amour was selected for post-race blood and urine testing. Dr. Barbara Greene, the State veterinarian for the Meadowlands Racetrack, drew the blood sample, and Ellen Mertine collected the urine sample. The samples were sent to Industrial Laboratories in Denver, Colorado for testing. On June 6, 2023, Industrial Labs issued its final forensic analysis report finding Mon Amour's urine sample tested positive for three banned substances: Oxycodone, an opioid used to treat pain; Carisoprodol, a medication used to treat musculoskeletal pain; and Meprobamate, a medication used to treat anxiety and insomnia. These drugs did not appear in the blood

2

sample. Neither party disputes the accuracy of the test results or that Mon Amour had the banned substances in his urine on April 29, 2023.

On June 7, 2023, the Commission issued a memorandum stating Mon Amour tested positive for the banned substances and authorized a search of Engblom's licensed off-track stabling facility, Magical Acres Training Center, for drugs and drug paraphernalia. The search did not lead to any contraband being found.

On October 13, 2023, a State investigator and the administrator of investigations provided their report detailing the investigation of Mon Amour's positive test results on behalf of the Commission. The report noted Oxycodone is listed as a Class 1 performance enhancing substance pursuant to the Association of Racing Commissioners International (ARCI). Class 1 substances are defined as the most dangerous and subject to the most severe penalties. The report also noted Meprobamate and Carisoprodol are Class 2 substances.

As part of its investigation, the Commission interviewed former Meadowlands Judge Thomas Salerno,[1] who presided over the Meadowlands Board of Judges's (Board of Judges) hearing, and Engblom. Judge Salerno

---

[1] Salerno is now the Assistant Director of the Commission.

A-2841-24

indicated the search of Engblom's premises did not lead to finding or confiscating any contraband.

Engblom stated that Mon Amour was stabled at Magical Acres Training Center, a farm licensed by the Commission, during the week of the subject race. Engblom mentioned that Judge Salerno had advised him of his right to request a "split sample," a technique where samples are collected from the same location and then sent to separate laboratories for analysis. Engblom requested a split sample of the tests, which was sent to Texas A&M Veterinary Medical Diagnostic Laboratory (TVMDL). On July 19, 2023, TVMDL received the samples and confirmed the presence of drugs in Mon Amour's urine on April 29, 2023.

On December 6, 2023, the Board of Judges conducted a hearing. Engblom testified he was training eighty-seven horses and had twenty-five employees. Engblom represented that he has never been suspended by the Commission for positive tests or possession of illegal contraband. Further, Engblom testified that Mon Amour was the only horse with a positive test result out of the 450 tests performed in Engblom's stable in 2023.

After concluding the testimony and evidence, the Board of Judges determined the presence of Oxycodone, Carisoprodol, and Meprobamate in

A-2841-24

Mom Amour's urine sample violated three regulations: N.J.A.C. 13:71-23.1(a), (b)(1) (prohibiting horses from racing with drugs and/or substances foreign to the horse); N.J.A.C. 13:71-23.6(a) to (d) (making the trainer responsible for insuring the horse does not race with drugs and/or substances foreign to the horse); and N.J.A.C. 13:71-7.29(a)(13) (prohibiting acts or conduct detrimental to the sport).

The Board of Judges imposed a 365-day suspension of Engblom's trainer's license and a $5,000 fine for the positive Oxycodone positive test result, and a fifteen-day suspension and a $1,000 fine for the positive Carisoprodol test result. Engblom's total penalty was a 380-day suspension and a $6,000 fine. Mon Amour was disqualified from sharing in the purse under N.J.A.C. 13:71-23.7, and eight MMV points were imposed. Engblom's suspension was set to begin on March 15, 2024, and end on March 29, 2025.

Engblom filed a notice of appeal, and the Commission transmitted the matter to the Office of Administrative Law (OAL) as a contested case. Engblom requested a stay of the decision, which was granted. The ALJ held a hearing on May 7, 2024, limited to the issue of the reasonableness of the penalty. The Commission called Judge Salerno and Dr. Greene as witnesses. Engblom testified on his own behalf and called Dr. Clara Fenger, an expert in equine

physiology, exercise physiology, pharmacology, and internal medicine, to testify on his behalf.

Dr. Greene testified that she oversees the staff that performs the drug testing on the horses. She confirmed that she conducted the blood testing and Mertine conducted the urine testing on Mon Amour on April 29, 2023. Dr. Greene explained that the horses selected for drug testing are immediately taken to the detention barn after the race.

On cross-examination, Dr. Greene testified that no one from the Commission ever contacted her during the investigation about Mon Amour being physically contacted by a human while in "the winner's circle" after the race. In response to a question posed by the ALJ, Dr. Greene testified that she does not use gloves during the blood sampling process. On re-direct, Dr. Greene explained she does not wear gloves because she does not contact the horse during the injection because the needle has a "protective coat." However, she testified her staff wears gloves during the urine collection process.

Judge Salerno testified he was accredited in 2005 through a Racing Officials Accreditation program at the University of Louisville and served as a judge since 2007 for various racetracks in this State, Pennsylvania, Delaware, and Maryland. Regarding Mon Amour's positive drug tests, Judge Salerno

A-2841-24

testified that the Commission tests two horses each race: the winning horse, and a "special" who is usually the second place finisher, but the Commission tries "to pick at random."

Further, he explained that if a horse tests positive, the Commission informs the State Police, which then goes to search the trainer's barn or stable to ensure there are no drugs or paraphernalia there. According to Judge Salerno, the Presiding Judge also informs trainers of their right to "request a split sample" and have the sample or samples tested by a second laboratory approved by the ARCI. Judge Salerno testified the next step is for the investigators to prepare a report. At the three-judge hearing, the Commission presents the lab report and split sample, and the trainer has an opportunity to present a defense. He testified the Commission's "Trainer Responsibility Rule" provides that the trainer is "the absolute insurer" responsible for the care, custody, and control of his or her horse, including that the horse is drug free.

Judge Salerno testified the Commission's rules provide that the Board of Judges must impose specific penalties for certain drugs but have discretion for other drugs. By way of example, Judge Salerno stated if a horse tests positive for a drug that does not provide for a specific penalty, then the Board of Judges considers the circumstances of the situation and looks to the ARCI's Uniform

Classification Guidelines for Foreign Substances and Recommended Penalties Model Rule (ARCI Guidelines). The ARCI Guidelines have four separate Drug Classes. Class 1 are the most dangerous drugs and have the most severe penalties. He explained a Class 1 drug "has absolutely no use to be in a horse and should never be in a horse," whereas Class 2 or 3 drugs are "threshold drugs" that may have a "therapeutic" purpose. Judge Salerno went on to testify horses may consume Class 2 or 3 drugs if it is "far enough out" from a race.

Further, Judge Salerno stated that the ARCI Guidelines provide separate "penalty categor[ies] of A, B, or C" for each drug, with Category A being the most severe. He testified that the ARCI serve as guidelines, which the Board of Judges does not "have to stick to [one] hundred percent but . . . we certainly try to stay as consistent as possible and . . . use it as just a guideline."

Regarding Engblom's hearing, Salerno confirmed that he was the presiding judge and the Board of Judges considered all relevant factors, the ARCI Guidelines, their own independent research, and discussions with experts in the field. Judge Salerno explained that Oxycodone, Carisoprodol, and Meprobamate were not drugs that had mandatory penalties attached, so the Board of Judges had discretion in determining Engblom's penalty. Judge Salerno testified Oxycodone is Drug Class 1, and a Penalty Class A substance,

warranting a 365-day suspension for a first-time offender as per the ARCI Guidelines. The Board of Judges then considered the Carisoprodol result, found it was a Drug Class 2, Penalty Class B substance, and imposed a fifteen-day suspension pursuant to the recommendation of the ARCI Guidelines' recommendation for first-time offenders. Judge Salerno testified the Board of Judges did not impose penalties for the positive Meprobamate result because it is a metabolite[2] of Carisoprodol.

Regarding fines, Judge Salerno explained Engblom was fined $5,000 for Oxycodone, which is consistent with the Commission's past rulings, and $1,000 for Carisoprodol, which is "on the low end" of ARCI Guidelines. Judge Salerno further explained the Board of Judges considered Engblom's "very clean record" and the fact that he "has raced horses for a long time and . . . did[ not] have a history of medication violations." On cross-examination, Judge Salerno conceded that Engblom has "the third most starts . . . in all of harness racing," and there had been no other positive tests.

Engblom testified he received his trainer's license in New Jersey in 2002. He stated he has never been fined or suspended for any medical-related

---

[2] A metabolite is a biological breakdown product of a drug after it goes through the animal's body.

violations. Engblom explained he sent 1,300 "starters" out in 2024, which is in the top three most of any trainer in the United States and Canada. He testified that the 380-day suspension, if upheld, would lead to his closing the family business.

Dr. Fenger testified that the presence of the drugs in Mon Amour's system "resulted from oral or mucus membrane contact with a human whose hands were contaminated with these drugs after completion of race [six]" and "touched the horse's gums, the bit, or bridle." Dr. Fenger opined the drugs were not found in Mon Amour's blood to support her conclusion that the metabolization rate was thirty minutes. Dr. Fenger testified the most likely source of the exposure would have been in the winner's circle by a groomer or "test barn personnel" and was "outside of any possibility of contact" by Engblom. She concluded Mon Amour "did not enter or start the race" with Oxycodone or Carisoprodol in his system.

On January 2, 2025, the ALJ issued his initial decision. He found all witnesses "credible." The ALJ determined Mon Amour came into contact with the drugs after the race but before testing based on Dr. Fenger's testimony. The ALJ noted the drugs were likely transferred to Mon Amour via oral or mucus membrane contact with a human with contaminated hands "post-race" and within thirty minutes of the urine test. The ALJ concluded "the offending

substances did not factor into the outcome of the race." In addition, the ALJ found the 380-day suspension was "draconian" and "extremely severe." The ALJ affirmed the three-judge ruling that Engblom violated N.J.A.C. 13:71-23.1(a), (b)(1), N.J.A.C. 13:71-23.6(a) to (d), and N.J.A.C. 13:71-7.29(a)(13), the $6,000 penalty, disqualification from sharing the purse, and imposition of eight MMV points. However, the ALJ recommended a reduced penalty of a ninety-day suspension.

On January 9, 2025, the Commission sought, and the OAL granted, a forty-five-day extension until April 2, 2025, to issue its final decision as provided by N.J.S.A. 52:14B-10(c) and N.J.A.C. 1:1-18.8(e). At a public meeting held on March 19, 2025, the Commission addressed the ALJ's initial decision, rejected the reduced penalty, and reimposed the Board of Judges's 380-day license suspension. This rejection occurred at the March 19, 2025 public meeting prior to the statutory April 2, 2025 deadline.

The Acting Executive Director found Dr. Fenger's conclusion was "flawed" because it was based on "guesses and conjecture," and reliance on two studies, "which do not confirm a metabolization rate of precisely [thirty] minutes." The Acting Executive Director pointed out that even if the two studies could be read to confirm such a metabolization rate, "neither study involved the

mucus membrane contact, which Dr. Fenger [] claims was most likely involved in this case." Moreover, the Acting Executive Director highlighted the studies were based on morphine ingestion, not Oxycodone or Carisoprodol.

The Acting Executive Director noted the low level of offending substances found is "immaterial" because Oxycodone and Carisoprodol are "non-threshold drugs." Citing N.J.A.C. 13:71-23.1(a), the Acting Executive Director stated "[t]he integrity of racing cannot be assured based on guesses and conjecture, and it does not guard the health of the horse to have these substances in [his] system."

In its April 23, 2025 final decision, the Commission memorialized its ruling. The Commission found Engblom violated N.J.A.C. 13:71-23.1(a), (b)(1), N.J.A.C. 13:71-23.6(a) to (d), and N.J.A.C. 13:71.7.29(a)(13), but rejected the ALJ's recommendation of a reduced license suspension. The Commission's decision reiterated the reasons expressed at the March 19, 2025 public meeting for rejecting the ALJ's recommendation.

The Commission emphasized Dr. Fenger used "equivocal language" in her report concerning her opinion that metabolization is complete "after exactly thirty minutes." Moreover, the Commission noted she acknowledged during her testimony that the method by which the substances were administered to Mon

Amour could have affected the length of time it took to reach his liver and metabolize. The Commission found Dr. Fenger's theory of administration was based solely on "conjecture" and was not supported by the academic literature.

The Commission held there was a lack of evidence supporting the ALJ's finding that the drugs were transferred to Mon Amour with a human whose hands were contaminated post-race. The Commission also disagreed with the ALJ's finding that Dr. Fenger's testimony was unrebutted because it did not present expert testimony based on cross-examination of the expert, which questioned her conclusions. The Commission held "Dr. Fenger's view lacks support in medical literature and essentially amounts to an unsupported extrapolation based on the pharmacodynamics of a different drug," which is "also immaterial to the question of whether a violation occurred."

Regarding Engblom's suspension, the Commission explained that the ALJ failed to appreciate the seriousness of the substances as Oxycodone is a Class 1 and Carisoprodol and Meprobamate are Class 2 substances under the ARCI Guidelines. As such, the Commission determined that "[i]mprecise guessing and conjecture cannot be the basis for mitigation, especially in a case involving drugs of such a high classification." Therefore, the Commission held that the penalties imposed by the Board of Judges were appropriate given the seriousness

13

of the violations and they were within the ranges recommended by ARCI Guidelines. The Commission re-imposed the 380-day license suspension and vacated the stay.

Engblom appeals, arguing the Commission's decision was arbitrary, capricious, and unreasonable. Engblom contends: (1) the ALJ's January 2, 2025 initial decision should be adopted because the Commission erred in failing to issue its determination in a timely fashion accepting, rejecting, or modifying the ALJ's decision with sufficient, competent, and credible evidence; and (2) even if the ALJ's initial decision is not deemed adopted, the Commission's final decision was based on mistaken and erroneous findings.

II.

We begin our discussion with a review of the principles governing our analysis. Pursuant to N.J.S.A. 52:14B-10(c):

> All hearings of a State agency required to be conducted as a contested case under this act or any other law shall be conducted by an [ALJ] . . . . A recommended report and decision which contains recommended findings of fact and conclusions of law and which shall be based upon sufficient, competent, and credible evidence shall be filed[] . . . with the agency . . . and an opportunity shall be afforded each party of record to file exceptions, objections, and replies thereto, and to present argument to the head of the agency or a majority thereof, either orally or in writing, as the agency may direct.

A-2841-24

. . . .

> The head of the agency, upon a review of the record submitted by the [ALJ], shall adopt, reject or modify the recommended report and decision . . . . In reviewing the decision of an [ALJ], the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision but shall state clearly the reasons for doing so. The agency head may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record. In rejecting or modifying any findings of fact, the agency head shall state with particularity the reasons for rejecting the findings and shall make new or modified findings supported by sufficient, competent, and credible evidence in the record . . . .

Thus, "[i]t is the agency head's responsibility to decide adjudicated matters brought before the agency." Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 586 (1988). "[T]he agency head must explain why the ALJ's decision was not supported by sufficient credible evidence or was otherwise arbitrary." Cavalieri v. Bd. of Trs. of Pub. Emps. Ret. Sys., 368 N.J. Super. 527, 534 (App. Div. 2004) (citing N.J.S.A. 52:14B-10(c)).

"Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (citing In re Herrmann, 192 N.J. 19, 27 (2007)). "An administrative agency's final quasi-

judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Ibid. (quoting Herrmann, 192 N.J. at 27-28).

We examine:

> (1) whether the agency's action violates express or implied legislative polices, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant facts.
>
> [Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

"In assessing those criteria, a court must be mindful of, and deferential to, the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). "We have upheld the strict and close regulation of the racing industry; we recognize and give deference to the Racing Commission's expertise." Moiseyev v. N.J. Racing Comm'n, 239 N.J. Super. 1, 7 (App. Div. 1989) (citing De Vitis

v. N.J. Racing Comm'n, 202 N.J. Super. 484, 490-91 (App. Div. 1985)). "We understand that the overriding goal in the regulations is to insure the public's confidence in the integrity of horse racing." Ibid. (citing Dare v. State, 159 N.J. Super. 533, 537 (App. Div. 1978)). We do not "substitute [our] own judgment for the agency's." Circus Liquors, 199 N.J. at 10 (quoting In re Carter, 191 N.J. 474, 483 (2007)).

However, we are "in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." Allstars, 234 N.J. at 158 (alteration in original) (quoting Dep't of Children & Families, DYFS v. T.B., 207 N.J. 294, 302 (2011)). The party challenging the final administrative action has the burden to demonstrate grounds for reversal. Lavezzi v. State, 219 N.J. 163, 171 (2014). Applying these well-established principles, we are satisfied Engblom failed to meet his burden.

### III.

We are not persuaded by Engblom's argument that the ALJ's decision should be deemed adopted by the Commission under N.J.S.A. 52:14B-10(c) because the Commission did not modify or reject the initial decision within forty-five days. The ALJ's initial decision was issued on January 2, 2025, which established a February 16, 2025 deadline under N.J.S.A. 52:14B-10(c). The

Commission requested and received its one-time forty-five-day statutory extension, which extended the deadline until April 2, 2025. Engblom maintains that the Commission did not provide its decision until April 23, 2025, and therefore, the ALJ's initial decision should be deemed adopted.

An ALJ's initial determination is "merely a recommendation" to the Commission. N.J. Election Law Enf't Comm'n v. DiVincenzo, 445 N.J. Super. 187, 193 (App. Div. 2016). In reviewing an ALJ's determination, "the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision but shall state clearly the reasons for doing so." N.J.S.A. 52:14B-10(c). However, "[u]nless the head of the agency modifies or rejects" the ALJ's decision within forty-five days, it "shall be deemed adopted as the final decision of the head of the agency." Ibid. If the agency cannot render a decision within forty-five days, the statute allows a "single extension of not more than [forty-five] days." Ibid. A request for such an extension "must be submitted no later than the day on which that time period is to expire." N.J.A.C. 1:1-18.8(b).

Our Supreme Court has explained that the Legislature amended N.J.S.A. 52:14B-10(c), "to set a strict deadline for administrative agencies 'to adopt, reject or modify' an ALJ's decision." In re Hendrickson, 235 N.J. 145, 158

18

(2019) (quoting N.J.S.A. 52:14B-10(c)). "Under the amendment, when the agency does not act within the forty-five-day statutory timeframe—or within the single extension period not to exceed forty-five days—the ALJ's decision is 'deemed adopted as the final decision of the head of the agency.'" Ibid. (emphasis added) (quoting N.J.S.A. 52:14B-10(c)).

Here, the record shows that the Commission acted to reject the ALJ's initial decision at its public meeting on March 19, 2025, well within the forty-five-day extension deadline that ended on April 2, 2025. The Commission later formalized its March 19, 2025 action on April 23, 2025, by publishing its final agency decision. As we held in Cavalieri, where, as here, an agency "signaled its intentions to reject the initial decision" within the statutory deadline and "issued its final decision reasonably promptly thereafter," the ALJ's initial decision is not deemed adopted pursuant to N.J.S.A. 52:14B-10(c). Cavalieri, 368 N.J. Super. at 539. We are therefore satisfied there is no basis to conclude the ALJ's initial decision should be deemed adopted by the Commission under N.J.S.A. 52:14B-10(c).

IV.

We do not agree with Engblom's argument that the Commission's decision was "mistaken and erroneous" because it: (1) misunderstood, refused to accept

19

without sufficient basis, and "was unreasonably and wholly dismissive of the only expert testimony provided" that the drugs were not administered until after the race; (2) failed to acknowledge the lack of any impact of the identified drugs; and (3) failed to address mitigating factors raised in the ALJ's initial decision.

Here, the Commission stated with particularity its reasons for rejecting the ALJ's acceptance of Dr. Fenger's expert opinion. See N.J.S.A. 52:14B-10(c). The Commission found the ALJ's determinations were either not supported by the record or, in some instances, were contradicted by the record. Ibid. We observe that the Commission did not "simple substitute its judgment for that of the ALJ's," but instead, relied on credible testimony that contradicted the ALJ's determinations. Cavalieri, 368 N.J. Super. at 523. Our independent review reveals that the record undermines the ALJ's credibility findings and includes sufficient evidence supporting the Commission's credibility findings and other findings of fact, all of which find support in the evidence.

Finally, we find no error in the Commission's rejection of the ALJ's recommended reduced suspension. The Commission was vested with the authority to determine the penalty; it was not bound by the ALJ's opinion regarding the sanction. N.J.A.C. 1:1-18.6(b). As Mon Amour's trainer, Engblom was ultimately responsible for the horse's care. N.J.A.C. 13:71-23.6.

The Commission concluded that Engblom did not protect Mon Amour and that the ALJ's penalty was inappropriate where the presence of Class 1 and 2 drugs was detected.

Considering the Legislature's broad grant of power to the Commission, N.J.S.A. 5:5-22, and the "intent of [the administrative] rules to protect the integrity of horse racing, to guard the health of the horse, and to safeguard the interests of the public and racing participants through the prohibition and/or control of all drugs and/or substances foreign to the natural horse," N.J.A.C. 13:71-23.1(a), we do not conclude the imposition of a 380-day suspension and $6,000 fine to be "so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Herrmann, 192 N.J. at 28-29.

To the extent we have not addressed any of Engblom's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(D).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-2841-24